United States Court of Appeals,

Fifth Circuit.

No. 95-11146.

ARA AUTOMOTIVE GROUP, Plaintiff-Counter Defendant-Appellant-Cross-Appellee,

v.

CENTRAL GARAGE, INC., Defendant-Counter Claimant-Appellee-Cross-Appellant,

Robert A. Bauman, Jr., Defendant-Counter Claimant-Appellee-Cross-Appellant.

Oct. 10, 1997.

Appeals from the United States District Court for the Northern District of Texas.

Before JONES, STEWART and DENNIS, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This dispute stems from the termination of Central Garage, Inc. as an ARA Automotive Group ("ARA") distributor. ARA sued on a sworn account for goods delivered, and Central Garage counterclaimed for breach of contract, breach of fiduciary duty, and Texas DTPA violations. After offsetting jury verdicts in favor of both sides, the district court entered a modest net judgment for Central Garage.

Both sides now appeal on multiple grounds. Our principal conclusion is that there is insufficient evidence to support the jury's finding that ARA owed Central Garage a fiduciary duty. Accordingly, we reverse and remand for recalculation of the effect of the offsetting jury verdicts.

I. Background

Based on the facts revealed at trial, ARA manufactured air conditioners and other auto parts in Grand Prairie, Texas. Central Garage, a distributor of ARA products in Florida from 1953 until 1989, had become ARA's largest distributor by the mid-1980s. The parties had a written distributorship agreement that was terminable at will and negotiated a new marketing agreement every November to cover prices, credit, and other terms for the coming year. The parties generally followed this new agreement beginning December 1, although the written agreement might not be signed until as late as January or February of the next year. The last marketing agreement was signed in January 1988. Central Garage's obligation to ARA under the agreements was secured by guarantees executed first by Robert Bauman, Sr., who ran Central Garage until 1982, and later by Robert Bauman, Jr., who succeeded his father in the business. In addition to the distributorship and marketing agreements, the companies entered into several other written contracts, including agreements for Central Garage to provide engineering services in the development of ARA after-market power locks and power windows, and an agreement for Central Garage to open a retail store featuring ARA products with an annual $50,000 subsidy from ARA.

Other agreements between the parties were not reduced to writing. The most fiercely disputed agreement in the case was a promise allegedly made in early 1988 by Mark Kalupa, then ARA's president. Kalupa testified that he told Bauman, Jr. that Central Garage could maintain a balance on its account with ARA of up to $500,000, interest-free. The alleged purpose of this "floating

balance" arrangement was to assist Central Garage with its plans to expand its retail operations in Florida. Although Kalupa did not specify a duration for the arrangement, both he and Bauman, Jr. testified that they assumed it would last at least until Central Garage's new Florida stores were comfortably established, or approximately three to five years.

ARA representatives testified that they had no knowledge of this arrangement before Kalupa was fired in December 1988,[1] and that if he did make it, it was unauthorized. No documentary evidence of a $500,000 floating balance was introduced at trial.

While the existence of the floating balance arrangement is disputed, it is undeniable that as of the end of 1988, the balance in Central Garage's account with ARA had ballooned. When Kalupa was dismissed, he was replaced by Howard Blank. As confirmed by ARA documents, Blank set out to improve ARA's profit margin on sales in Florida either by collecting the Central Garage account or entering the retail market directly.

Although ARA and Central Garage had agreed on pricing terms for a renewal of the marketing agreement to begin on December 1, 1988, no written marketing agreement had been executed as of February 1989. In February, Blank and other ARA officers initiated a series of meetings with Central Garage to renegotiate the marketing agreement for 1989 and to cause Central Garage to reduce its account balance. Negotiations were unpleasant and

---

[1]Kalupa was apparently fired for reasons not directly related to the subject matter of this suit. After his termination, Kalupa filed suit against ARA for breach of his employment contract.

3

unsuccessful.  ARA terminated the relationship, ending sales of its products through Central Garage and subsidy payments under the retail store subsidy agreement.

In April 1989, ARA opened a company-owned retail store in the Tampa area in direct competition with Central Garage.  ARA used information about Central Garage's operations to pursue customer leads and set its prices, initially at two dollars lower than Central Garage on most products.  ARA hired four employees from Central Garage's retail operations and offered substantial product incentives to induce dealers and other major Central Garage customers to patronize its store.  Central Garage lost customers, and testimony at trial in 1994 indicated that many of those customers had not come back.  Former ARA officers called the company's move into Tampa "predatory" and "malicious."  Even so, ARA's foray into retailing was short-lived:  in October 1990, it went out of business nationwide.

In May 1989, ARA filed this suit for payment of the outstanding balance in Central Garage's account.  Central Garage counterclaimed that ARA had breached the power window, power door lock, and retail store subsidy agreements and had violated the Texas Deceptive Trade Practices Act.  Central Garage also alleged that ARA and Central Garage had developed a fiduciary relationship in which each side shared confidential information and undertook to look out for the other party's interests. Central Garage contended that when Blank refused to honor the promise of a $500,000 floating balance, requested payment of the account, terminated Central

Garage's distributorship, and entered the Tampa retail market itself, ARA breached a fiduciary relationship that had been formed over a number of years.

After a trial that began in September 1994, the jury agreed, and awarded Central Garage $741,843.75 in damages for breach of fiduciary duty. The jury also awarded $100,000 to Central Garage on a claim that ARA's refusal in 1989 to continue subsidy payments under the retail store subsidy agreement was a breach of contract. However, the jury rejected Central Garage's DTPA claim and its claim that ARA breached the power door and windows agreements.

In ARA's behalf, the jury found that Central Garage owed $810,333.23 for goods delivered.[2] The court awarded each side $100,000 in attorneys' fees. An offset of these awards resulted in a $31,510.52 net judgment for Central Garage. The district court then awarded pre-judgment interest from June 30, 1990, the date on which the court found that the damages caused by ARA's breach of fiduciary duty accrued. Both parties now appeal.

## II. ARA's appeal

A. Breach of fiduciary duty.

ARA contends that there is insufficient evidence to establish a fiduciary relationship between itself and Central Garage and challenges the district court's refusal to grant judgment as a matter of law on this claim. We review the jury's verdict to determine if the facts and reasonable inferences point so strongly

---

[2]The jury also found that Robert Bauman, Sr. and Robert Bauman, Jr. personally guaranteed Central Garage's debt to ARA, but that Bauman, Sr. had been released from his guarantee by ARA.

and overwhelmingly in favor of one party that reasonable minds could not arrive at a different verdict. *See Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 308 (5th Cir.1989), *cert. denied,* 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990).

Under Texas law, a supplier/distributor relationship is not the type of formal relationship that automatically gives rise to a fiduciary duty. *Crim Truck & Tractor v. Navistar Int'l,* 823 S.W.2d 591, 594 (Tex.1992); *Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477, 481 (Tex.App.—Corpus Christi 1989, writ denied). A fiduciary relationship may arise from a variety of relationships where the parties are "under a duty to act for or give advice for the benefit of another upon matters within the scope of their relation." *Texas Bank and Trust Co. v. Moore,* 595 S.W.2d 502, 507 (Tex.1980). The existence of a fiduciary relationship, outside of formal relationships that automatically give rise to fiduciary duties, is usually a fact intensive inquiry. *Moore,* 595 S.W.2d at 508. However, when the evidence offered is no evidence of a fiduciary relationship, the issue can be determined as a matter of law. *Crim Truck,* 823 S.W.2d at 594. Under Texas law, "a fiduciary duty will not be lightly created" since "it imposes extraordinary duties" and requires the fiduciary to "put the interests of the beneficiary ahead of its own if the need arises." *Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.,* 55 F.3d 181, 188 (5th Cir.1995). ARA contends that Central Garage only presented evidence demonstrating, at best, subjective trust, cordiality, length of relationship and other matters that do not support a finding of fiduciary

6

relationship.[3]

Central Garage points to the parties' long history of "oral and written agreements, joint undertakings, shared confidences and cooperative ventures" which support the jury's verdict. Bauman, Jr. remembered ARA executives staying at his family's home when his grandfather was running Central Garage in the 1950s. Robert Baccus, President of ARA until 1986, and Bauman, Sr., who owned Central Garage until 1982, were close friends. The Bauman and Baccus families socialized often, vacationed together, and often did business on a handshake basis. ARA paid for the honeymoon trips of Bauman, Sr.'s children. ARA's Baccus wrote in a business letter to Central Garage in 1979: "I would lean over backwards to avoid hurting you regardless of its effect on ARA."

When it was time for Bauman, Jr. to take over Central Garage, Baccus persuaded Bauman, Sr. to retire earlier than he otherwise would have. Baccus respected Bauman, Jr., and saw him as a more aggressive businessman than his father. Baccus even considered hiring Bauman, Jr. for an officer position at ARA. Bauman, Jr. considered his relationship with Baccus to be almost like a "father-son" relationship.

After Bauman, Jr. took over Central Garage in 1982, he was invited by ARA to attend meetings at ARA offices with top

---

[3]*See Crim Truck,* 823 S.W.2d at 594 ("fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship"; cordiality and long duration are no evidence of a fiduciary relationship); *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962) ("Mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship").

executives. Bauman, Jr. was privy to information about ARA's strategy, products, and pricing, but, although he was asked not to reveal what he learned, he was not asked to sign a confidentiality agreement. Bauman, Jr. traveled with Baccus on several occasions to help evaluate business opportunities for ARA. Bauman, Jr. met with ARA Vice President Jerry O'Pry in 1988 to help set the prices that ARA would charge all of its distributors. Bauman, Jr. made recommendations to ARA regarding its choice of suppliers for power window and keyless entry products. Norman Vail, a national sales manager for ARA, testified that in working with Bauman, Jr. on engineering projects, they "were like brothers."

Mark Kalupa, who succeeded Baccus as president of ARA in 1986, and Bauman, Jr. testified that the parties regarded aspects of their relationship as a partnership.[4] By contract, Central Garage employees provided engineering services for ARA's after-market power locks and windows, in return for a royalty for every product sold by ARA.[5] Bauman, Jr. also made instructional presentations to

---

[4]Mark Kalupa testified:

> Q: What was the nature of your working relationship between ARA on the one hand and Central Garage on the other as they approached these agreements and followed through on them?
>
> A: Very close relationships. It was a partnership agreement between two firms. I would say it was a very close working relationship between the two companies.

Bauman, Jr.'s testimony about a "partnership" was in the context of assisting O'Pry with the pricing and marketing plans.

[5]The written power window and power lock agreements called for Central Garage to receive $1.00 from each unit sold, rather than a

8

other ARA distributors and was well-respected at ARA.

ARA's parent company set a goal of building ARA from $130 million in revenues in 1986 to $500 million by 1991. To achieve this goal, ARA began to work with Central Garage to expand sales of ARA products. Central Garage was the only ARA distributor to receive a promise that ARA would assist its expansion into new markets.[6] In 1987, ARA agreed to subsidize Central Garage's development of new retail stores, beginning with a small prototype store in a strip mall. ARA would provide $50,000 for each of the prototype store's first three years of operation, and Central Garage allowed ARA to approve how the money was spent and provided ARA with marketing and financial information about the store.

ARA's Kalupa attempted to persuade Central Garage to pursue a significant number of free-standing retail stores. To encourage this expansion, Kalupa orally agreed[7] to the $500,000 floating balance arrangement. Central Garage began to rely on Kalupa's

fee for engineering services.

[6]An April 1987 letter from ARA's Dan Kelly to Central Garage read:

> We at ARA anticipate continued growth at Central Garage which will, we believe, command an ever-growing commitment of funds to Central Garage.... This financing may take the form of direct financing of expansion by Central Garage into new markets and/or products.

[7]Kalupa testified:

> I just had an oral agreement with Rob [Bauman] that I had a lot of faith in. There was no need for it [a writing]. It was an oral agreement, a partnership with someone we had a great deal of trust in, and we didn't put it in writing.

promise, taking full advantage of the $500,000 floating balance to help finance new stores.

The pivotal case for evaluating this evidence is the Texas Supreme Court decision in *Crim Truck,* which reversed a jury verdict finding a fiduciary duty between a franchisor and franchisee. 823 S.W.2d at 592. The *Crim Truck* court found no evidence of a confidential, or fiduciary, relationship between Navistar and the Crim family, who had operated a Navistar (formerly International Harvester) franchise since 1943. *Id.* at 593. The evidence of confidence, trust and reliance over the course of the parties' 42-year relationship was held to be no evidence of a relationship that required Navistar "to put the Crims' interests before its own," because

> this argument clashes with the rule that a party to a contract is free to pursue its own interests, even if it results in a breach of that contract, without incurring tort liability. The fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship. Every contract includes an element of confidence and trust that each party will faithfully perform his obligation under the contract.

*Id.* at 594-95 (citations omitted).

During the 42-year relationship, the Crims "had always done the things requested by the Franchisor ...," including moving their store and setting up a "prototype building suggested by International Harvester." *Id.* at 595, n. 6. The franchisor had previously held the Crims out as "an excellent dealership with whom they hope to continue a long and fruitful relationship." *Id.* The parties had operated for the first 15 years without any written agreement at all. *Id.* at 593. The written contract only allowed

10

for termination if the Crims violated one of eleven conditions and explicitly stated that the agreement was one "involving mutual confidence and trust...." *Id.* at 595-96. Notwithstanding their lengthy relationship, Navistar unilaterally terminated the Crims for failing to purchase a new computer system required by Navistar, a decision decried as arbitrary, since fewer than fifty percent of all the franchisees were using the new system. *Id.* at 602 (Mauzy, J., dissenting).

Following *Crim Truck,* this court has twice dealt with attempts to impose a fiduciary relationship on otherwise arms-length business relationships. In *Floors Unlimited,* we affirmed summary judgment for a carpet manufacturer on a fiduciary claim brought by a terminated dealer. 55 F.3d at 188. The manufacturer had repeatedly used the term "partnership" with its dealers, allegedly to create the image of a more than "arms length" transaction. *Id.* However, we rejected the use of the term "partnership" as evidence of a fiduciary relationship because it was "mere conversation." *Id.* The parties had operated for 11 years based only on an oral agreement. *Id.* The court also rejected evidence of trust and confidence between the parties as support for a fiduciary duty, since this is "what is customarily shared between business associates." *Id.* at 188. The manufacturer and dealer agreed "to work together out of self-interest, [but] they had different goals and were free to pursue their own interests." *Id.*

*Lee v. Wal-Mart Stores, Inc.,* 943 F.2d 554, 557-560 (5th Cir.1991), *modified* 951 F.2d 54, relied on *Crim Truck* in reversing

11

a jury verdict that found a fiduciary relationship between a developer and a retailer.  The developer, Lee, had bought land and constructed stores under oral assurances that Wal-Mart would later sign a lease.  *Id.* at 556.  In the disputed transactions, Lee relied on Wal-Mart's encouragement to purchase land for development, but Wal-Mart backed out.  *Id.*  We held that the asserted "relationship based on repeated transactions" and a profitable business arrangement was not a fiduciary relationship under *Crim Truck* and earlier Texas cases.  *Id.* at 557.  Earlier Texas cases had recognized fiduciary duties only when parties "were looking to profit from a shared risk, e.g., an oil and gas well, or the sale of a particular property" and not where the "parties' positions, harmonized for purposes of self-interest, were yet naturally antagonistic."  *Id.* at 558-59.[8]  We ultimately concluded that Wal-Mart could not be required to bear the responsibility to look out for Lee's best interest.  *Id.* at 559.

The parallels between the present case and the previous cases are obvious, yet Central Garage's briefs make no attempt to distinguish them.  Instead, it cites cases enumerating the various factors present in this case as indicative of a fiduciary relationship.[9]  Since *Crim Truck,* however, few Texas cases have

---

[8]*Citing Schiller v. Elick,* 150 Tex. 363, 240 S.W.2d 997, 1000 (1951);  *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 261 (1951);  *MacDonald v. Follett,* 142 Tex. 616, 180 S.W.2d 334, 339 (1944);  *Gaines v. Hamman,* 163 Tex. 618, 358 S.W.2d 557 (1962).

[9]*See Thigpen,* 363 S.W.2d at 253 (communication of confidential information;  but declining to find fiduciary relationship between trust officer of bank and grocery store owners who were "close friends" and saw each other frequently;  bank officer helped

12

found fiduciary relationships outside of legal relationships that carry fiduciary duties as a matter of law.[10]  No Texas case cited by Central Garage or uncovered in our research has affirmed a fiduciary obligation in the context of a franchisor-franchisee, manufacturer-distributor relationship, or other transactional setting involving experienced managers.  Federal courts that have applied Texas law to such relationships have not found a fiduciary

---

guaranteed loans for owners, served as a business advisor, and was shareholder in owners' corporation); *Consolidated Bearing & Supply Co., Inc. v. First Nat'l Bank of Lubbock,* 720 S.W.2d 647, 649 (Tex.App.—Amarillo 1986, no writ) (length and nature of the relationship between the parties;  but affirming judgment finding no fiduciary between bank and long-time customer, despite relationship of trust and disclosing information customer would not disclose to public;  "only proof of long-standing banker-depositor relationship");  *Harris v. Sentry Title Co., Inc.,* 715 F.2d 941, 946 (5th Cir.1983), *modified,* 727 F.2d 1368, *cert. denied* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984) (parties' close, personal or family like ties;  but reversing finding of fiduciary duty allegedly based on single joint venture); *Consolidated Gas & Equip. Co. v. Thompson,* 405 S.W.2d 333, 336 (Tex.1966) (degree of trust reposed in one party by another;  but reversing imposition of constructive trust;  "usual cases of fiduciary relationship have been attorney-and-client, partners, close family relationships such as that of parent-and-child, and joint adventurers, particularly when there is an agreement among the joint venturers to share financial gains and losses"); *United Teachers Assoc. Ins. Co. v. MacKeen & Bailey, Inc.,* 99 F.3d 645, 649-650 (5th Cir.1996) (affirming district court's finding of fiduciary relationship between insurer and actuary on whom insurer relied).

[10]*See, e.g., General Resources Organization, Inc. v. Deadman,* 907 S.W.2d 22, 31 (Tex.App.—San Antonio 1995, writ denied) (affirming jury verdict on breach of fiduciary duty against attorney who provided false guarantees to buyer in gold scam); *Sassen v. Tanglegrove Townhouse Condo. Ass'n,* 877 S.W.2d 489, 492 (Tex.App.—Texarkana 1994, writ denied) (affirming jury verdict on fiduciary breach against attorney-in-fact of condo owner).  *See also United Teachers Associates,* 99 F.3d at 649;  *Heden v. Hill,* 937 F.Supp. 1230, 1238 (S.D.Tex.1996) (denying summary judgment on fiduciary claim against attorney who represented plaintiff's former partner and former company); *Sanders v. Casa View Baptist Church,* 898 F.Supp. 1169, 1176 (N.D.Tex.1995) (denying summary judgment on fiduciary claim against plaintiffs' marriage counselor).

13

obligation.[11]

We decline to be the first.  Even given the extensive evidence of cooperation and friendship cited by Central Garage, the jury's verdict cannot be sustained consistent with Texas law.  These two sophisticated businesses entered into a number of contracts for mutual benefit, but the evidence does not demonstrate that either party agreed to put the other's interests ahead of its own.  *See Crim Truck,* 823 S.W.2d at 594.  Every major agreement governing the relationship between ARA and Central Garage, with the exception of the "floating balance" arrangement, was eventually reduced to a writing that explicitly set out the parties' obligations.  The distributorship agreement, the annual marketing agreements, the power window agreement, and the power lock agreement all permitted either party to terminate the contract, for any reason, upon thirty days notice.  Central Garage did not have an exclusive territory.  The power lock and power windows agreements specifically stated that Central Garage was an independent contractor, despite Bauman, Jr.'s input into the selection of the supplier.  *Compare Crim Truck,* 823 S.W.2d at 596, n. 7 (agreement only cancelable for enumerated causes;  recited that it was "a personal agreement, involving mutual confidence and trust ...").  ARA insisted on and got individual guaranties from the Baumans.  The testimony

---

[11]*See Floors Unlimited,* 55 F.3d at 188 (affirming summary judgment for carpet manufacturer against dealer);  *Lee,* 943 F.2d at 557-60 (reversing jury verdict finding fiduciary duty between developer and retailer);  *Hionis Intern. Enterprises v. Tandy Corp.,* 867 F.Supp. 268, 274 (D.Del.1994), *aff'd* 61 F.3d 895 (3d Cir.1995) (applying Texas law) (granting summary judgment for manufacturer against dealer).

14

referring to the parties' relationship as a "partnership" does not change its nature. *See Floors Unlimited,* 55 F.3d at 188; *Thanksgiving Tower Partners v. Anros Thanksgiving Partners,* 64 F.3d 227, 231 (5th Cir.1995).

Central Garage relies heavily on Baccus's 1979 letter promising that he would "lean over backwards to avoid hurting you regardless of its effect on ARA." Baccus wrote to assuage Central Garage's complaints about ARA's selling MAPA parts in Florida. The next lines read:

> However, I do have a responsibility to our company and to the market place. And unless there is more evidence than we have covered in our discussion, I have no alternative but to approve the use of the MAPA line as it is now being programmed in Florida.

This letter is hardly evidence of a fiduciary relationship: Baccus, Bauman, Jr.'s father figure, put Central Garage on notice that when their interests diverged, ARA would look out for itself. It would be patently unreasonable for Central Garage to believe that ARA would put its own interests aside, in a fiduciary-like manner, to further the interests of Central Garage.

The other key factors supporting a fiduciary relationship under the Texas cases are simply not present here. There is no agreement to share profits or losses. ARA did not exercise such control over Central Garage, its largest and most important distributor, as to create a situation of "disproportionate bargaining power and control" inherent in other relationships where a fiduciary duty has been found. *See Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987) (unequal

15

bargaining power and exclusive control of insurer gives rise to fiduciary duty to insured in settling claims); *Adolph Coors Co.,* 780 S.W.2d at 481 ("the supplier-distributor relationship does not require special protection, nor does the supplier have the same exclusive control over the distributor's business that the insurer has over the insured's claim").

Taking Bauman, Jr.'s descriptions of his relationships with Baccus and other ARA officers to their fullest implications, there is insufficient evidence to support a finding of fiduciary duty. *See Crim Truck,* 823 S.W.2d at 594-95.[12] Even Baccus, who was arguably Bauman, Jr.'s closest confidant at ARA, expressly informed Central Garage that ARA's interests ultimately came first. In any event, Baccus retired in 1986. Although Bauman, Jr. describes a friendship with Kalupa, nothing in his testimony raises it above a cordial business relationship. And Kalupa was not the key to doing business with ARA; other investors controlled the company. Although Bauman, Jr. may have had reason to believe that Chip Hart, an owner and member of the board, supported Central Garage's expansion plans until early 1988, there is absolutely no indication that his relationship with the Harts could have given rise to a fiduciary duty. But if he had any expectation that ARA ownership was looking out for Central Garage's interests, it should have ended as of August 1988, when Bauman, Jr. learned that the Harts

---

[12]*See also Rutherford v. Exxon Co.,* 855 F.2d 1141, 1146 (5th Cir.1988) ("We cannot equate faith built up over years of a business relationship such as the one in this case with the confidence that, for example, a client places in her attorney").

16

had placed ARA up for sale.

Furthermore, unless routine manufacturer-distributor relationships are to be considered fiduciary, the jury verdict can not be sustained in this case on the basis that ARA possessed confidential information. All of the "confidential" information, for example, the computer printout of all the ARA parts bought by Central Garage in 1987 and 1988, is information that would normally be exchanged between a manufacturer and a large distributor. A manufacturer can hardly be expected not to have a list, by part number, of all inventory sold to each customer. Other information, such as Central Garage's sales and profits, is not unusual in any agreement where a manufacturer will be extending significant credit. Central Garage's price list was public and could be obtained from any of its customers. The retail store blueprints and merchandising layouts were bargained for by ARA as part of the written retail subsidy agreement for the explicit purpose of using them in other ARA stores.

Although ARA's subsequent use of this information might have been improper under an unfair competition theory, the mere possession of this information by a manufacturer could not give rise to a fiduciary duty without stretching the Texas cases beyond recognition. As the Texas Supreme Court has opined, "a constructive trust [imposed upon breach of a fiduciary duty] does not arise on every moral wrong and [ ] cannot correct every injustice." *Pope v. Garrett,* 147 Tex. 18, 211 S.W.2d 559, 562 (1948).

17

Finally, the "floating balance" credit arrangement is not evidence of a fiduciary relationship. Central Garage officials testified that this was not uncommon in the industry.[13] Furthermore, Kalupa himself testified that, although he did not see a business justification for doing so, the floating balance arrangement could be called at any time by the president of ARA.

Accordingly, the jury verdict finding a fiduciary relationship between ARA and Central Garage is based on legally insufficient evidence, and the motion for judgment as a matter of law should have been granted.

B. Breach of retail store subsidy agreement.

Under the retail store subsidy agreement, ARA was to provide $50,000 per year to Central Garage to subsidize a prototype retail store. Central Garage sought, and the jury awarded, $100,000 in damages based on ARA's failure to make the payments for 1989 and 1990. ARA argues that because Central Garage was no longer a distributor, no longer obtained ARA approval for expenditures, and no longer reported results of operations to ARA, ARA's obligation to make the subsidy payments was relieved as a matter of law.

There is, however, sufficient evidence that Howard Blank breached and/or repudiated the contract before Central Garage ceased to be a distributor and before the three-year contract

---

[13]*See In re Letterman Bros. Energy Securities Litigation,* 799 F.2d 967, 975 (5th Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987) (creditor-debtor relationship not fiduciary; breach of promise to provide financing is not breach of fiduciary duty). In December 1988, while still an ARA distributor, Bauman, Jr. obtained a $250,000 floating balance arrangement from another manufacturer.

expired; ARA, therefore, is not relieved of its otherwise contingent obligation.[14] Finally, ARA continued to make monthly payments for six months after telling Central Garage to stop providing the required information, arguably waiving the conditions precedent to ARA's liability. The jury verdict must be sustained.

C. Offsetting of damage awards.

In calculating the judgment amount, the court offset the jury's awards to ARA and Central Garage, and calculated prejudgment interest on the net judgment of $31,510.52 in favor of Central Garage.[15] ARA argues that the district court should not have offset the awards before calculating prejudgment interest because the distributorship agreement and the marketing agreement entitled ARA to 1.5% per month, or 18% per year, in interest from January 1, 1991 through the date of judgment on its sworn account claim. ARA contends that the offsetting should have been done after the calculation of prejudgment interest on the awards at the different rates.[16] Central Garage counters that the district court has the discretion to prevent unjust enrichment by offsetting jury awards before calculating prejudgment interest. *Infra-Pak (Dallas), Inc.*

---

[14]*See Rich v. McMullan,* 506 S.W.2d 745, 747 (Tex.Civ.App.—San Antonio 1974, writ ref'd n.r.e.) ("one who prevents or makes impossible the performance of a condition precedent upon which his liability under a contract is made to depend cannot avail himself of its nonperformance").

[15]ARA's sworn account claim ($810,333.23)—Central Garage breach of contract claim ($100,000)—Central Garage's breach of fiduciary duty claim ($741,843.75) = $31,510.52.

[16]By ARA's calculations, it was owed $796,983.97 in prejudgment interest as of October 1994 (the date of judgment).

*v. Carlson Stapler & Shippers Supply, Inc.,* 803 F.2d 862, 866 (5th Cir.1986). The district court found that the damages for breach of fiduciary duty were fixed as of June 30, 1990, six months before the account balance was found due and owing. Since the district court's decision was predicated on the verdict against ARA for breach of fiduciary duty, we decline to address the parties' arguments on this point. The district court ought to revisit this issue on remand in the absence of the verdict on breach of fiduciary duty.

D. Calculation of Attorneys' fees

The district court awarded attorneys' fees of $100,000 to each party and then offset the awards against each other. Although ARA presented evidence that it had incurred $896,691.20 in attorneys' fees, the district court found that ARA's sworn account claim was a relatively simple claim. The district court also found that the bulk of the trial was focused on Central Garage's counterclaims, that ARA's fees included bills from two separate law firms preparing for the trial, and that ARA had three changes in representation with the inherent duplication that accompanies such changes. The district court also found that ARA's defense of Central Garage's counterclaims was not interrelated to or inseparable from the sworn account claim.

ARA argues that since it had to defend against the counterclaims in order to recover on its sworn account, it should be able to recover attorneys' fees for the work of defending the

counterclaims.[17] However, given the district court's discretion in setting the amount of fees[18] and its explicit findings, we find no reason to disturb its calculation of ARA's attorneys' fees.

### III. Cross-Appeal of Central Garage.

A. Estoppel defense to ARA's sworn account claim

Central Garage alleges that ARA: 1) encouraged Central Garage to overextend itself in reliance on Kalupa's promise of interest-free use of $500,000 for at least three to five years; 2) declared the account balance due within a year of Kalupa's promise; 3) refused to take back unused inventory; 4) opened a store in Tampa to drive Central Garage out of business; and 5) filed this suit for the account balance despite Kalupa's testimony that the floating balance was not due at the time suit was filed. Central Garage claims this meets the definition of estoppel: as a result of one party's words or conduct, another is induced to change his position for the worse. *Wheeler v. White,* 398 S.W.2d 93, 96 (Tex.1965).

Although the court instructed the jury on estoppel, Central Garage contends that the court erred when it refused to give a separate jury question on the estoppel defense. ARA contends that because of the separate instruction, the charge, taken as a whole,

---

[17]*See Flint & Assoc. v. Intercontinental Pipe & Steel,* 739 S.W.2d 622, 624 (Tex.App.—Dallas 1987, writ denied) (if counterclaims interrelated with or inseparable from plaintiff's claim, plaintiff allowed attorneys' fees for defending counterclaims against its claim for purchase price of goods sold).

[18]*In re Smith,* 966 F.2d 973, 978 (5th Cir.1992).

correctly instructed the jury. *See Coughlin v. Capitol Cement Co.,* 571 F.2d 290, 300 (5th Cir.1978). Citing no authorities, Central Garage counters that the instruction is "meaningless" without a question for the jury to answer on the estoppel defense.

ARA's argument is persuasive. Central Garage could have argued to the jury, with the full support of the court's instruction, that ARA was estopped from seeking recovery on its account. The court's error, if any, in refusing to submit a separate interrogatory was harmless.

B. DTPA claim against ARA

Central Garage first argues that there is no evidence to support the jury's verdict on its DTPA claim and thus Central Garage should be awarded a new trial on this issue. Central Garage did not move for a directed verdict below, thus we review the jury's verdict that ARA did not commit DTPA violations to determine if there is *any* evidence to support the finding. *Zervas v. Faulkner,* 861 F.2d 823, 832 n. 9 (5th Cir.1988). Although Central Garage does not credit evidence contrary to its position, such evidence exists in the record and prevents reversal under our narrow standard of review.

Second, the parties agree that Texas law on DTPA causation requires that the deceptive practice be a "producing" cause, not "proximate" cause of the plaintiff's injuries. They also agree that the district court erroneously instructed the jury to apply the more demanding proximate cause standard to Central Garage's DTPA interrogatory. But as Central Garage did not object to this

22

instruction, it may only insist on appeal that the wording is a plain error warranting a new trial on the DTPA issue.[19] Fed.Rule Civ.P. 51. To show plain error, Central Garage must show that "an incorrect statement of law was probably responsible for an incorrect verdict, leading to substantial injustice." *Fruge v. Penrod Drilling Co.,* 918 F.2d 1163, 1169 (5th Cir.1990). Based on the facts developed at trial and Central Garage's theory of DTPA violations, we cannot find plain error in this case.

Third, Central Garage argues that the district court erred in submitting a jury question on ARA's estoppel defense to the DTPA claim. The jury found in favor of ARA on this issue, but the common law defense of estoppel cannot defeat a Texas DTPA claim. *Kennemore v. Bennett,* 755 S.W.2d 89, 91 (Tex.1988). Since we have affirmed the jury verdict that there was no DTPA violation, the error in giving the estoppel instruction was harmless.

### IV. Conclusion

For the foregoing reasons, we REVERSE the denial of judgment as a matter of law on the fiduciary duty claim, VACATE the judgment, and REMAND for entry of judgment in favor of ARA rejecting the fiduciary duty claim and for further proceedings in accordance herewith.

---

[19]Central Garage did submit an instruction with a "producing" cause standard, but this was not included in the court's final charge.