**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 94-50503**
_____

**UNITED TEACHERS ASSOCIATION INSURANCE COMPANY,**

**Plaintiff-Counter-Defendant-**
**Appellee-Cross-Appellant,**

**VERSUS**

**MACKEEN & BAILEY, INC. and W. DUNCAN MACKEEN,**

**Defendants-Counter-Plaintiffs-**
**Third-Party Plaintiffs-**
**Appellants-Cross-Appellees,**

**VERSUS**

**THE WHIDBEE CORP., HOYT W. WHIDBEE, JR.,**
**AND DAVID M. MORGAN,**

**Third-Party Defendants-**
**Appellees-Cross-Appellants.**

_____

Appeal from the United States District Court
for the Western District of Texas
_____

October 10, 1996

Before LAY,[*] DUHÉ and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

An insurance company filed this suit for breach of fiduciary duties against its actuary.  We hold that the actuary, because of

_____

[*]   Circuit Judge of the Eighth Circuit, sitting by designation.

the particular facts of his relationship with the company, was a fiduciary, and that he breached his fiduciary duties to the company. We hold, however, that the district court erred in applying the usurpation of corporate opportunity doctrine to a corporate fiduciary other than an officer, director or major shareholder, and reverse and render the recovery based on that theory. Otherwise, we generally affirm the findings and awards of the district court.

**FACTS**

David Morgan and Hoyt Whidbee bought United Teacher Associates Insurance Company ("UTAIC") in 1981.[1] In 1984, Duncan MacKeen[2] was hired to provide actuarial services for UTAIC. MacKeen suggested that UTAIC purchase blocks of business[3] from other insurance companies which he believed possessed blocks of business with redundant reserves.[4] MacKeen convinced UTAIC that certain

---

[1] The factual summary is drawn from the district court's findings of fact, *United Teacher's Associates v. MacKeen & Bailey*, 847 F. Supp. 521, 525-29 (W.D. Tex. 1994), which we review for clear error. *Silmon v. Can Do II, Inc*., 89 F.3d 280, 282 (5th Cir. 1996).

[2] Duncan MacKeen was a partner in the actuarial firm of MacKeen & Bailey, Inc. ("MacKeen & Bailey"), a defendant in this action.

[3] Groups of similar insurance policies owned by an insurance company are known a "blocks of business."

[4] Insurance companies maintain funds to be used to pay claims, both current and future. These funds are known as "reserves." The level of reserves are determined by a combination of factors, including state insurance regulations. Reserve requirements can vary depending on the type of insurance policy, location of insureds, and other conditions. Actuaries use mathematical means

insurance companies were using excessively conservative methods in calculating reserve levels, and that he could properly calculate the levels and eliminate the redundant reserves, which would free capital for use in other profit-making activities. At first Morgan was skeptical of this plan because he could "not understand how MacKeen could pull profits out of thin air by simply recalculating the reserves." *MacKeen*, 847 F. Supp. at 526.

Nevertheless, Morgan, Whidbee and MacKeen entered into an oral agreement whereby the three would receive equal shares of whatever profits UTAIC realized from these acquisitions. Under this arrangement, Whidbee and Morgan (through UTAIC) provided 100% of the capital to finance the acquisitions while MacKeen provided his time and actuarial expertise to locate blocks of business with overstated reserves and recalculate them after UTAIC's acquisition.

Between 1986 and 1989 UTAIC made several successful acquisitions and reaped substantial profits. Morgan became dissatisfied, however, that MacKeen was risking none of his own capital, but was still receiving one-third of the profits. In

---

to generate reliable predictions regarding claims, losses premiums, and other information in order to determine the appropriate level of reserves. Different insurance companies and actuaries use different methods in calculating reserve requirements. Some use a more conservative approach which keeps reserve levels high relative to predicted claims, while others are more aggressive, keeping reserves as low as possible. Reserves that are in excess of the amounts actually necessary to pay known and anticipated claims are called "reserve redundancies." When an insurance company purchases a block of policies from another company it ordinarily acquires the reserves attached to that block of policies. If the acquired block of policies contains redundant reserves, the acquiring company can recalculate the reserves. The amount of redundant reserves then can be moved from the reserve category (which is a liability for accounting purposes), to the surplus category (an asset).

3

1989, Morgan, Whidbee and MacKeen ended their oral profit sharing arrangement and MacKeen & Bailey began receiving a $12,500 monthly retainer fee from UTAIC pursuant to a written retainer agreement which specified Texas law as controlling between the parties.

In mid-1991, another insurance company, National Foundation Life ("National"), began experiencing regulatory pressure because its capital was deemed too low. National estimated that an increase of its capital and surplus to $6 million would appease the insurance regulators. To achieve this goal, National decided to sell selected blocks of business. National began soliciting bids for these blocks in July 1991. UTAIC was a prospective purchaser and requested MacKeen to do an audit of National's insurance block. After examining a particular block known as the "Heart/Cancer Block," MacKeen advised Morgan and Whidbee that its reserves were between 50% and 75% redundant and that the block would be profitable at a purchase price of up to $18 million. In late August, Whidbee offered National $13 million for the Heart/Cancer Block. Negotiations between UTAIC and National stalled, but National did not sell the block to another company.

In January 1992, Whidbee and MacKeen went to National headquarters to re-evaluate the reserves. While they were at National, Whidbee gave permission for National to talk with MacKeen about retaining him to assess National's rate increases. MacKeen agreed to provide actuarial services for National. On January 22,

4

1992, following the visit to National, UTAIC offered National $10 million for the block.

On January 27, 1992, MacKeen began evaluating the reserves in the Heart/Cancer Block on behalf of National. UTAIC was still under the impression that MacKeen was merely providing rate increase calculations for National, and MacKeen did not notify UTAIC that he was, instead, recalculating the reserves. Several counter-offers were made by each side during the next several weeks. On February 13, 1992, MacKeen submitted to National his recalculation of the reserves in the Heart/Cancer Block which created an additional $7.8 million in capital and surplus for National. After this recalculation, negotiations ceased between UTAIC and National for sale of the block.

On March 1, 1992, MacKeen signed statutory filings as actuary for both UTAIC and National. Approximately two weeks later, on March 13, 1992, MacKeen began purchasing stock shares in Westbridge Capital Corporation, the parent company of National. At this time, the market was not aware of the $7.8 million increase in capital and surplus and its impact on Westbridge Capital's stock value. On March 31, National made public the data which showed the $7.8 million increase. After the publication Westbridge Capital's stock value rose to $8.25 per share. MacKeen testified that he purchased 46,300 shares of stock at the average price of $3.50 per share. By the summer of 1992, he had become the owner of a significant volume of stock in National's parent company.

In March 1992, MacKeen told Whidbee that he had helped National to reduce its reserve redundancy. He also told Whidbee that he had bought numerous shares of Westbridge Capital stock. Upset by this news, Whidbee immediately called Morgan, who wanted to fire MacKeen immediately. After further reflection, however, Morgan and Whidbee decided that it would be wiser to keep MacKeen on retainer, as he was critical to several pending transactions.

In May 1992, UTAIC considered the purchase of a Medicare supplement block of business owned by the American Integrity Insurance Company. After visiting the company, MacKeen told Whidbee that the block of business was worthless. MacKeen then contacted John Scott, the individual who brokered the unsuccessful UTAIC/National deal MacKeen told Scott that National might be interested in the American Integrity block of business. MacKeen and Scott had an arrangement, unbeknownst to UTAIC or National, whereby MacKeen would receive a commission from Scott if National purchased the American Integrity block of business. If, however, UTAIC purchased the block, MacKeen would not receive a commission. In August 1992, MacKeen examined the American Integrity block again, this time for National. He told the company that it was a good buy and, in September, National purchased the block from American Integrity, with Scott brokering the deal. In October 1992, Scott gave MacKeen a $30,000 commission for brokering the transaction.

6

## PROCEDURAL BACKGROUND

UTAIC filed suit against MacKeen and his actuarial firm, MacKeen & Bailey, Inc., in Texas state district court. The case was removed to federal court under diversity jurisdiction. UTAIC alleged that MacKeen's conduct with respect to the Heart/Cancer Block and American Integrity transactions constituted breaches of fiduciary duties, tortious interference with prospective business and contractual relationships, and fraud. UTAIC also alleged that MacKeen breached or repudiated the retainer agreement and that UTAIC had no obligation to continue retainer disbursements. MacKeen counterclaimed, alleging that UTAIC's failure to pay the $12,500 monthly retainer fee after December 1992 was a breach of the retainer agreement, a breach of UTAIC's duty of good faith and fair dealing, and fraud.

Following a bench trial, the district court found for UTAIC on its claims regarding the Heart/Cancer Block. Specifically, the district court found that a fiduciary relationship existed between MacKeen and UTAIC, which MacKeen breached by recalculating the block for National. The district court found, however, that the confidential relationship ended in March 1992 when Whidbee learned of MacKeen's actions, prior to the American Integrity transaction. Therefore, the district court found that MacKeen did not breach a fiduciary duty to UTAIC in his dealings with the American Integrity purchase. The district court found that the losses to UTAIC for the Heart/Cancer Block were $240,000 and found MacKeen and MacKeen & Bailey jointly and severally liable for this amount. The

7

district court also ordered MacKeen to personally pay UTAIC $219,925, the amount he profited from the Westbridge Capital stock purchases. The district court further found MacKeen and MacKeen & Bailey jointly and severally liable to UTAIC for $250,000 in exemplary damages.[5]

Finally, the district court found that UTAIC breached the retainer agreement by not paying the monthly retainer from January through October 1993. Thus, MacKeen & Bailey was awarded $125,000.

MacKeen and MacKeen & Bailey appeal the judgment of the district court, and UTAIC filed a contingent cross-appeal.

**DISCUSSION**

**Breach of Fiduciary Relationship**

*Whether a Fiduciary Relationship Existed*

Under Texas law, certain relationships are fiduciary as a matter of law. For example, attorney/client, principal/agent, and partners. *Lee v. Wal-Mart Store, Inc.*, 943 F.2d 554, 558 n.7 (5th Cir. 1991); *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980). Outside these specific relationships, Texas courts

---

[5] The district court held that because MacKeen breached his fiduciary duty, "it is implicit that he committed constructive fraud and violated his duty of good faith and fair dealing." *MacKeen*, 847 F. Supp. at 534. Therefore, the district court did not address those claims separately. The district court also found that MacKeen did not commit actual fraud, tortious interference, or breach the retainer agreement. UTAIC does not appeal these findings.

The district court dismissed MacKeen's and MacKeen & Bailey's counterclaims for breach of duty of good faith and fair dealing and fraud. This dismissal is not appealed.

8

determine whether a fiduciary relationship exists on a case by case basis. ***Thigpen v. Locke***, 363 S.W.2d 247, 253 (Tex. 1962). A fiduciary relationship "exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. . . ." ***Moore***, 595 S.W.2d at 507. "It exists where a special confidence is reposed in another who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." ***Id***. If the extent, nature and duration of the relationship is such that one party has become "accustomed to being guided by the judgment or advice of the other, or is justified in placing confidence in the belief that such party would act in its interest," then a confidential relationship exists. ***Thompson v. Vinson & Elkins***, 859 S.W.2d 617, 624 (Tex. App.--Houston [1st Dist.] 1993, no writ). The Texas Supreme Court has made clear, however, that "mere subjective trust alone is not enough to transform arms length dealing into a fiduciary relationship . . . businessmen generally trust one another and their dealings are frequently characterized by cordiality." ***Thigpen***, 363 S.W.2d at 253.

The existence of a fiduciary relationship is a question of fact, ***Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.***, 55 F.3d 181, 188 (5th Cir. 1995), which we review for clear error. ***Silmon v. Can Do II, Inc.***, 89 F.3d 280, 282 (5th Cir. 1996).

The district court found that:

> For seven years . . . MacKeen had served as the only actuary for UTAIC. During that period, Morgan and Whidbee developed a great deal of trust and confidence in his work. They risked substantial

9

amounts of capital on the accuracy (or creativity) of his reserve recalculations and the soundness of his advice. Whidbee testified he relied primarily on MacKeen's spreadsheets when drafting acquisition offers as he was not an actuary and did not have the expertise of MacKeen. MacKeen testified that prior to January of 1992, he had performed reserve recalculations for UTAIC between 80 and 100 times. Undoubtedly, the extent, nature, and duration of MacKeen's employment with UTAIC created a confidential relationship between UTAIC, MacKeen, and MacKeen & Bailey, Inc.

*MacKeen*, 847 F. Supp. at 530.[6] These findings are not clearly erroneous.[7]

---

[6] After finding that a fiduciary relationship existed, the district court went on to say:

Finally and parenthetically, the Court declares that actuaries, in view of the type of professional services they provide and the information confided in them, have a fiduciary relationship with their clients as a matter of law under the criteria established by the Texas courts.

*MacKeen*, 847 F. Supp. at 530. We note that this statement by the district court is dicta because the court had already concluded that MacKeen was a fiduciary.

We do not share the district court's view that actuaries are, as a matter of Texas law, fiduciaries. There is no Texas statute so stating and there is no decision of the Texas Supreme Court nor of any Texas Court of Appeals so holding. It is possible, as in the instant case, that an actuary may become a fiduciary through a confidential relationship. However, whether such a fiduciary relationship exists is determined on a case by case basis taking into consideration the particular facts of the relationship, as discussed above.

[7] As noted above, the district court also found that the fiduciary relationship ended in March 1992 when Whidbee learned that MacKeen had recalculated reserves for National. *MacKeen*, 847 F. Supp. at 533. Therefore, the district court found that no fiduciary relationship existed during the American Integrity Transaction. Because UTAIC has not appealed this finding, we do not review it.

10

*Whether MacKeen Breached his Fiduciary Duty*

Because we hold that the district court was correct in finding a fiduciary relationship between MacKeen and UTAIC, we must now determine whether the district court erred in finding that MacKeen breached his fiduciary duty to UTAIC. A fiduciary relationship imposes the duties of "good faith and candor by the fiduciary toward his principal. This includes the general duty of full disclosure respecting matters affecting the principal's interests and a general prohibition against the fiduciary's using the relationship to benefit his personal interest, except with the full knowledge and consent of the principal." ***Chien v. Chen***, 759 S.W.2d 484, 495 (Tex. App.--Austin 1988) (internal quotation and citation omitted). Likewise, a fiduciary has a duty to "act with candor, unselfishness, and good faith." ***Annesley v. Tricentrol Oil Trading, Inc.***, 841 S.W.2d 908, 910 (Tex. App.--Houston [14th Dist.] 1992, writ denied).

As discussed above, National was under extreme regulatory pressure in January 1992. To raise capital and relieve that pressure, National had to either sell off the Heart/Cancer Block or determine its overstated reserves and convert that amount to capital and surplus. National officials had tried for months to determine the amount of redundant reserves in the block, but they had not been able to solve the problem. Because National could not recalculate the reserves themselves, they were going to have to sell the block, a less desirable alternative.

11

Just as National had resigned itself to selling the block, MacKeen informed it that he could perform the recalculation. National asked UTAIC if MacKeen could help it with its rate increase problem, and UTAIC consented. MacKeen, however, never performed rate increase work for National; instead, he spent his time recalculating the redundancies in the Heart/Cancer Block. Two weeks after being hired by National, MacKeen informed the company that the block contained $7.8 million in redundant reserves. This is roughly the same advice MacKeen had previously given UTAIC regarding the block. With the transfer of $7.8 million to capital and surplus, National was able to satisfy its regulators without selling the Heart/Cancer Block to UTAIC.

The district court found that "MacKeen's actions had the effect of disclosing to National what he had discovered during due diligence for UTAIC." *MacKeen*, 847 F. Supp. at 532. MacKeen secretly recalculated National's reserves so National would not have to sell the block to UTAIC, to whom he was a fiduciary. As a result of MacKeen's actions, UTAIC lost what it would have gained had it bought the Heart/Cancer Block with the reserves unrecalculated. Therefore, the district court's finding that MacKeen breached his fiduciary duty to UTAIC is not clearly erroneous.

**Corporate Opportunity Doctrine**

The district court also found that MacKeen usurped a corporate opportunity when he recalculated National's reserves without notifying UTAIC. We have said that:

12

> Texas corporation law applies the 'corporate opportunity' doctrine where a corporation has a legitimate interest or expectancy in, and the financial resources to take advantage of, a particular business opportunity. When a corporate officer or director diverts a corporate opportunity to himself, he breaches his fiduciary duty of loyalty to the corporation.

*In re Safety International, Inc.*, 775 F.2d 660, 662 (5th Cir. 1985) (internal citations omitted).

Because the district court found that MacKeen usurped a corporate opportunity, it imposed a constructive trust on him and his firm for the amounts they benefitted by his actions. In determining the amount which MacKeen benefitted, the district court found that the opportunity to purchase the Heart/Cancer Block of business was worth $240,000 to UTAIC. The court imposed a constructive trust on MacKeen & Bailey in this amount. The district court determined that MacKeen personally benefitted $219,925 from his stock purchases (his 46,300 shares rose $4.75 each, for a total of $219,925). The district court imposed a constructive trust in this amount on MacKeen personally.

MacKeen contends that the district court erred in applying the corporate opportunity doctrine because he was not an officer or director of UTAIC, but rather the company's fiduciary. The district court recognized that most corporate opportunity cases involve officers or directors, but the district court held that the doctrine "can be used to disgorge interests improperly or surreptitiously acquired by any fiduciary of the corporation." *MacKeen*, 874 F. Supp. at 537-38.

We believe that under Texas law the usurpation of corporate

13

opportunity doctrine does not apply to all corporate fiduciaries, but is limited to officers, directors and major shareholders who are fiduciaries. While it is true that several Texas cases use the broader term "corporate fiduciary" in discussing the doctrine,[8] we have found no Texas cases, nor has UTAIC cited us to any, applying the corporate opportunity doctrine to any person other than an officer, director or major shareholder. We certainly have found no Texas cases standing for the proposition that this doctrine applies to all corporate fiduciaries. Therefore, the district court erred in applying the corporate opportunity doctrine because MacKeen, although a corporate fiduciary, was not an officer, director or major shareholder. Additionally, we note that there is no evidence whatsoever in the record that UTAIC ever considered buying the stock of National's parent company. Thus, it is doubtful whether the stock truly was a "corporate opportunity."

**Repudiation**

The district court found that the retainer agreement had been repudiated due to MacKeen's improper conduct. The court held that the contract was discharged in October 1993 and that each party was free to retain any benefits received from the contract. The district court declined to return the parties to their pre-

---

[8]   *See, e.g., **International Bankers' Life Ins. Co. v. Holloway**, 368 S.W.2d 567, 576-77 (Tex. 1963) (referring to corporate fiduciaries); **General Dynamics v. Torres**, 915 S.W.2d 45, 49 (Tex. App.--El Paso 1995, writ denied); **Thywissen v. Cron**, 781 S.W.2d 682, 686 (Tex. App.--Houston [1st Dist.] 1989) ("A corporate fiduciary cannot usurp corporate opportunities for personal gain. . . ."); **Imperial Group (Texas), Inc. v. Scholnick**, 709 S.W.2d 358, 363 (Tex. App.--Tyler 1986, writ ref'd n.r.e.).

14

agreement positions. To do so would have given MacKeen one-third of the profits UTAIC earned. The district court found that in light of MacKeen's actions, "it would be absurd to re-establish that relationship." **MacKeen**, 847 F. Supp. at 543.

We find that the district court did not clearly err in finding that the contract was repudiated and in discharging all parties from remaining obligations under the contract. We agree with the district court that it would be inequitable to allow MacKeen, after his gross breaches of fiduciary duties, to maintain a one-third interest in UTAIC's profits.

## Consideration for Modification

UTAIC and MacKeen modified their 1989 oral agreement when they executed the retainer agreement. Under the oral agreement MacKeen was to receive one-third of UTAIC's profits, while under the retainer agreement MacKeen & Bailey received $12,500 per month from UTAIC. MacKeen contends that the modification of the contract was invalid because it was without consideration. We disagree. MacKeen has pointed us to no evidence showing that it was not possible that, at some time, the monthly retainer would exceed the profit-sharing arrangement. The possibility that MacKeen would receive more income from the retainer agreement provides adequate consideration for the modification.

## CONCLUSION

We hold that the district court did not err in finding that MacKeen, by his conduct concerning the National acquisition,

15

breached a fiduciary duty he owed to UTAIC.[9]  The district court found MacKeen and MacKeen & Bailey jointly and severally liable for $240,000 for breach of the confidential relationship.  In its cross-appeal, UTAIC contends that the district court erred in this determination, and argues that the damages should be UTAIC's lost profits.  The testimony tendered by UTAIC in support of this damage claim was highly speculative and exceedingly complex and bore little relationship to "lost profits."  After reviewing the record we conclude that the district court did not clearly err in its damages calculation.  **AFFIRMED**.

The district court awarded UTAIC $219,925 from MacKeen individually for his usurpation of a corporate opportunity.  Because we hold that MacKeen was not an individual who could be held liable under the corporate opportunity doctrine, we **REVERSE** that portion of the district court's judgment and **RENDER** judgment that UTAIC take nothing from MacKeen for usurpation of a corporate opportunity.

The district court awarded UTAIC $250,000 in exemplary damages from MacKeen and MacKeen & Bailey jointly and severally.  We note that the district court was reluctant to award exemplary damages to UTAIC, given the blameworthy conduct of both parties.  We certainly understand the district court's reticence.  We, however, do not address the propriety of the exemplary damages award because

---

[9]  As noted above, UTAIC does not appeal the district court's finding that at the time of the American Integrity transaction no fiduciary duty existed, and thus no fiduciary duty was breached. Because this finding is not appealed, we do not review it.

16

MacKeen and MacKeen & Bailey did not raise before this Court any objection to that award, thus waiving any error. **AFFIRMED.**

Finally, the district court awarded MacKeen and Bailey $125,000 for UTAIC's breach of the retainer agreement. UTAIC does not contest this award and therefore waives any argument that the district court erred. **AFFIRMED.**

**AFFIRMED** in part and **REVERSED** and **RENDERED** in part.