**REVISED**

United States Court of Appeals,

Fifth Circuit.

No. 96-20963.

IMPERIAL PREMIUM FINANCE, INC., Plaintiff-Appellee,

v.

John KHOURY, et al., Defendants,

John Khoury and Southern Assurance Inc., Defendants-Appellants.

Dec. 1, 1997.

Appeal from the United States District Court for the Southern District of Texas.

Before DeMOSS and DENNIS, Circuit Judges, and LEE, District Judge.[*]

LEE, District Judge.

Plaintiff Imperial Premium Finance, Inc. filed this suit against appellants Southern Assurance, Inc. (SAI) and its president, John Khoury, asserting claims for, *inter alia,* breach of warranty and fraud in connection with a premium finance transaction arranged by SAI and Khoury on behalf of SAI's client, Monterrey, Ltd., a Nigerian company in the business of providing offshore oil rig support for certain American oil companies. Imperial alleged that Khoury and SAI, through Khoury and others, misrepresented the identity of Monterrey's insurers, the amounts of the premiums and the cancellation terms of the policies that were to be purchased with the funds advanced by Imperial pursuant to the finance

_____

[*]District Judge of the Southern District of Mississippi, sitting by designation.

1

agreement, which constituted fraud and breach of certain agent/broker warranties contained in the agreement. Following trial, the jury returned a verdict against both SAI and Khoury for fraud, awarding actual damages in the amount of $314,000 and $490,000 in punitive damages against each defendant. The jury also found against both SAI and Khoury on the breach of warranty claim, inexplicably assessing damages on that claim in the sum of $44,000. Imperial waived entry of judgment on the breach of warranty verdict, choosing instead to secure judgment against defendants only on the fraud claim.[1] The district court entered judgment on the fraud verdict and denied defendants' motion for a judgment notwithstanding the verdict or a new trial.

On appeal, defendants advance several grounds which they contend warrant reversal of the jury's verdict. Having considered defendants' arguments, we conclude that we must reverse and remand the case for a new trial.

*Background*

For several years preceding the transaction at issue, SAI, an independent insurance agency, had used Imperial for premium financing for its clients. For the policy year 1992-93, SAI had procured for Monterrey a hull policy and protection and indemnity (P & I) coverage from "Lloyds and ILU [Institute of London Underwriters] Companies" for a combined annual premium of nearly $2

---

[1]Neither plaintiff, defendants nor the district court were able to account for how the jury could have found damages of $44,000 on the breach of warranty claim when the parties agreed that the amount of compensatory damages at issue was $314,000.

2

million, of which approximately $1.5 million was financed by Imperial. When the time came for Monterrey to renew its policies or obtain other coverage, SAI again sought premium financing from Imperial on Monterrey's behalf. The record reflects that there was some question initially as to whether the "London market" would be able to provide the necessary coverages as it had for the prior policy year, and Imperial was thus advised by SAI that there would be "new players." Ultimately, however, SAI informed Imperial that the securities, or insurers, would be the same as in the previous year, and a premium finance agreement was prepared by SAI which, like the premium finance agreement of the preceding year, identified Monterrey's insurers as "Lloyds and ILU Companies." The agreement further recited January 31, 1993 as the effective date of coverage and reflected a combined annual premium of $2,763,000 for the two policies. Imperial financed nearly $2.2 million of that amount pursuant to the premium finance agreement which included not only the signature of Donald Koehl, Monterrey's president, but also reflected Khoury's signature under a paragraph entitled "Agent/Broker Warranty" which recited, in pertinent part, as follows:

> By submitting this agreement to Imperial [Plaintiff], the undersigned warrants and agrees: 1) That Borrower's signature is genuine, ... [that] Borrower has authorized this transaction in the manner required by applicable state law ... and agrees to the assignment of the security interest as set forth herein; 2) that Borrower has received a copy of this Agreement; 3) that the policies are in full force and effect and the information in the Schedule of Policies [appearing immediately above the warranties] and the premium is correct, that none of the policies listed is non-cancellable or written for a term of less than one year, ... 5) that all unearned premiums, dividends and unearned commissions will be paid to

3

Imperial, and that any lien on any unearned premium is subordinated to Imperial's lien or security interest therein; 6) that the policy(ies) can be cancelled on 10 days' notice.

After making a number of the monthly payments required by the agreement, Monterrey defaulted. When Imperial attempted to cancel the policies and recover the unearned premiums under the policies, which stood as collateral for Imperial's loan, Imperial learned that Monterrey's hull coverage had not been obtained from "Lloyds and ILU Companies," as represented in the premium finance agreement, but had instead been purchased for the same premium from North American Casualty Company, S.A., a Costa Rican insurer, and it discovered that while the P & I coverage was placed through the London market, the premium for that coverage was $102,000, substantially less than the $238,000 premium set forth in the premium finance agreement. Due to minimum unearned premium retention provisions in the policies, the amount of unearned premiums which Imperial was able to collect toward satisfaction of Monterrey's remaining indebtedness was not sufficient and a deficiency balance of approximately $314,000 remained. Accordingly, Imperial filed this suit against Monterrey and Koehl for their default.[2] Imperial also sued SAI and Khoury alleging breaches of the Agent/Broker Warranty and fraud arguing that because these defendants misrepresented the insurers and the terms of the policies for which premium financing was sought, plaintiff sustained damage when, upon Monterrey's default, it was unable to

---

[2]Imperial secured a default judgment against Monterrey and Koehl prior to the trial of its claims against SAI and Khoury.

4

collect on what it understood was its collateral because the policies which were actually issued, as contrasted with those that had been represented by defendants, did not have satisfactory cancellation terms for plaintiff's protection.

*Validity of the Premium Finance Agreement*

As one basis for reversal of the jury's verdict, defendants contend that since the Imperial premium finance agreement form had not received approval of the Texas Board of Insurance as of the time of the parties' transaction in accordance with TEX.INS.CODE ANN. art. 24.11(a) ("A premium finance agreement shall be in writing on a form approved by the board"), the agreement was void. Defendants then reason that since the agreement was void, it could not have been validly asserted by plaintiff as the basis for any of its causes of action against defendants and that consequently, the jury verdict must be set aside.[3] The district court rejected defendants' argument, concluding by reference to *McLaren v. Imperial Casualty & Indemnity Co.,* 767 F.Supp. 1364 (N.D.Tex.1991), *aff'd,* 968 F.2d 17 (5th Cir.1992), *cert. denied,* 507 U.S. 915, 112

---

[3]The particular premium finance agreement form used in the January 1993 Imperial/Monterrey transaction was first submitted to the Board for approval in May 1993. For more than a year, no action was taken by the Board on the form, and in June 1994, Imperial submitted a revised form to the Board for approval. At that time, the Board advised Imperial there was a problem on both forms relating to the statutory requirement that the forms contain "the amount or method of computing the amount of any default or delinquency charge that is payable in the event of late payment." art. 24.11(d)(3). Imperial submitted a revised form which corrected the problem identified by the Board and that form was approved by the Board in August 1994. The form submitted by Imperial in May 1993—the form involved in the transaction at issue in this case—was never approved or disapproved by the Board.

5

S.Ct. 1269, 122 L.Ed.2d 665 (1993), and *Travelers Insurance Co. v. Chicago Bridge & Iron Co.,* 442 S.W.2d 888, 893 (Tex.Civ.App.—Houston [1st Dist.1969], writ ref'd, n.r.e.), that the finance agreement executed by the parties was not illegal or void due to Imperial's failure to secure prior Board approval of its form. The courts in both of the cited cases, considering article 5.06 of the Insurance Code which permits insurers to use only policy forms approved in writing by the Board, held that the insureds could not use the fact of the Board's non-approval of the insurers' policy forms to prevent the insurers from enforcing exclusions in their policies, reasoning that the insureds could not insist on their right to coverage while at the same time denying the insurers' right to enforcement of exclusions from coverage. Rather, "when an insured seeks to enforce a policy, ... the insured cannot select the good and discard the bad. Instead, he must take or leave the policy in its entirety." *McLaren,* 767 F.Supp. at 1376. *See also Hertz Corp. v. Pap,* 923 F.Supp. 914, 922 (N.D.Tex.1995), *aff'd,* 98 F.3d 1339 (5th Cir.1996) ("The insured cannot choose to void only that language in the policy which does not favor her and retain the remainder of the policy, including the payment provisions."); *cf. Mutual Life Ins. Co. of New York v. Daddy$ Money, Inc.,* 646 S.W.2d 255, 257 (Tex.App.—Dallas, 1982, writ ref'd n.r.e.) (where insurer had secured approval of policy form but had not obtained Board approval of conflicting endorsement, in violation of Article 3.42 of Insurance Code, insurer could not enforce endorsement against insured so as to

6

restrict insured's coverage).

Though our rationale may be somewhat different, we are convinced, as was the district court, that the premium finance agreement is not void. Nothing in the language of article 24.11 or any other provision of the Texas Insurance Code suggests that the legislature intended that an agreement executed in violation of the statute be declared void. In fact, indications are to the contrary. No penalty provision is included within the terms of article 24.11, but article 24.08 makes any violation of Chapter 24 an "offense" which is a Class B misdemeanor, and article 24.05 specifically authorizes the Board to revoke or suspend a premium finance company's license if, after notice and hearing, the Board finds "that the licensee has violated this chapter," which, of course, includes article 24.11. Thus, a penalty for the violation is already prescribed by statute. *See Chicago Bridge,* 442 S.W.2d at 894 (fact that Act prescribed penalty for violation—revocation of insurer's permit—indicated legislative intention that policy not be declared void).

Furthermore, the legislature explicitly declined to invalidate premium finance agreements for more serious violations than the mere failure to obtain Board approval. More to the point, article 24.08(b) states:

> A premium finance company's taking or receiving from or charging an insured a greater charge than authorized by this chapter does not invalidate the premium finance agreement or the principal balance payable under the agreement but may be adjudged a forfeiture of all charges that the premium finance agreement carries with it or that have been agreed to be paid on the agreement.

7

In our opinion, this provision reflects a clear intent that the insured/borrower not be permitted to avoid its obligation under a premium finance agreement to repay the *principal* loan amount, though it may be relieved of what would otherwise have been its contractual obligation to pay additional charges where those charges are imposed in violation of the provisions of Chapter 24. This is consistent with the manifest purpose of Chapter 24, and article 24.11, in particular, which is protection of the insured/borrower under these types of agreements. Indeed, the concern to which article 24.11 is directed is evident from the language of the statute: full and complete disclosure *to the insured* of all terms of the loan, including all applicable charges and required payments. Where there is a failure of the complete disclosure contemplated by the statute, then the proper response might well be to invalidate those terms and conditions not disclosed, but not avoidance of the agreement in toto.[4]

Moreover, while we do not suggest that defendants lack standing to assert a challenge to the validity of this agreement,[5] the facts that these defendants are not insureds, for whose protection the statute was drafted, and that the warranties which

---

[4]Of course, had the form involved been *disapproved* by the Board rather than simply not affirmatively approved by the Board, the court's analysis would no doubt be different. But that is not the situation which we confront or the issue we address.

[5]Imperial argued to the court below that SAI and Khoury, not being insureds/borrowers under the premium finance agreement, lacked standing to challenge the validity of the premium finance agreement. The district court concluded that these defendants' interest in the agreement was sufficient to confer standing, and we do not disagree.

8

they are charged with having breached are not among the matters which article 24.11 mandates be included in premium finance agreements, tend to further persuade the court that defendants' argument in the case *sub judice* ought to be rejected.[6] Since the court concludes that the agreement is not void, the court finds no merit to defendants' contention that the lower court erred in excluding evidence that the form had not been approved by the Board. The trial court correctly concluded that defendants' evidence regarding the failure of approval was irrelevant and inadmissible.

*The Fraud Verdict*

Defendants' primary argument on appeal is that the jury's verdict for fraud cannot stand in view of the principle espoused by the Texas Supreme Court in *Southwestern Bell Telephone Co. v. DeLanney,* 809 S.W.2d 493, 494 (Tex.1991), that while the acts of a party may simultaneously breach duties in tort and contract, "[w]hen the only loss or damage is to the subject matter of the contract," the plaintiff's claim "ordinarily sounds only in contract." The court must reject defendants' argument, however, given the Texas Supreme Court's recent clarification in *Formosa Plastics Corp. v. Presidio Engineers,* 40 Tex.Sup.Ct.J. 877, 1997 WL 378129 (Tex. July 9, 1997), that *DeLanney* does not apply to

---

[6]Indeed, Imperial makes a plausible argument that since article 24.11 does not include agent/broker warranties among the matters which must be included in premium finance agreements, then the Agent/Broker Warranty contained in its premium finance agreement is severable from the remainder of the agreement and enforceable in spite of any defect in the terms of the premium finance agreement.

preclude tort damages in fraud cases.[7]

Defendants submit, alternatively, that even if plaintiff's fraud claim is not objectionable on *DeLanney* grounds, it still must be reversed inasmuch as it is legally and factually insufficient. More to the point, defendants object that the district court erred in failing to specifically instruct the jury that defendants could be found liable for fraud only if their challenged representations were false "when made." And, seeking relief from the district court's denial of their motion for judgment as a matter of law, they argue that there was not sufficient evidence from which the jury could have found that their representations were false when made.

Contrary to defendants' urging, the record discloses ample evidence from which the jury could have inferred that Khoury and SAI knew prior to preparing and presenting the premium finance agreement to Imperial that the insurance carriers, policies and terms reflected therein were not the carriers, policies and terms which they, in fact, intended to secure for Monterrey. And if the jury so found, the jury likewise had before it sufficient evidence from which it could also have inferred that defendants' purpose in misrepresenting these matters was to induce Imperial to loan monies

---

[7]In so ruling, the Texas court explicitly disapproved a number of state appellate court decisions which held that tort damages were not recoverable for a fraudulent inducement claim in the absence of an injury distinct from any permissible contractual damages. *Formosa Plastics,* 1997 WL 378129, at *7. The court thus implicitly rejected this court's conclusion in *Heller Financial, Inc. v. Grammco Computer Sales, Inc.,* 71 F.3d 518 (5th Cir.1996), and *Fielder v. King,* 103 F.3d 17, 20 (5th Cir.1997), which adopted the view of those disapproved state court decisions.

which it would not have loaned had it been apprised of the defendants' true intentions. Thus, there is evidence in the record which would support a verdict for fraud on the basis that Khoury and SAI made representations which were false "when made" with the intent that Imperial loan money to their client in reliance on those representations.[8]

However, in addition to its argument at trial that Khoury and/or SAI knew when the premium finance agreement was signed that the matters reflected therein relating to Monterrey's insurance coverage were false, plaintiff also suggested at trial that even if the jury were to find that Khoury and/or SAI correctly represented these matters in the premium finance agreement, the jury might nevertheless find SAI and/or Khoury liable for fraud if it determined that subsequent to their representations to Imperial but prior to Imperial's disbursement of funds to Monterrey, SAI and/or Khoury effected a change in Monterrey's insurance which they failed to disclose to Imperial. In our opinion, this theory of fraud liability is legally inadequate.

Under Texas law, in the absence of a duty to disclose, mere silence does not amount to fraud or misrepresentation; and a duty to disclose arises only where a fiduciary or confidential

---

[8]The only specific evidence to which defendants have pointed as having belied plaintiff's allegations of misrepresentation and breach of warranty (other than Khoury's denials of wrongdoing) is documentation which reflects that in December 1992, a month before the premium finance agreement was signed, plaintiff was apprised that there might be a "new player." However, when, a month later, defendants specifically represented that the players were the same as those of the previous policy year, plaintiff reasonably could have assumed that there were no new players.

relationship exists.  *Bay Colony, Ltd. v. Trendmaker, Inc.,* 121 F.3d 998, 1004 (5th Cir.1997) (quoting *Southwest E & T Suppliers, Inc. v. American Enka Corp.,* 463 F.2d 1165, 1166 (5th Cir.1972) ("Texas law is clear that if there is no confidential or fiduciary relation between the parties [creating a duty to disclose], mere silence does not amount to fraud or misrepresentation."). Imperial acknowledges this principle, but pointing out that it adduced evidence at trial of its fiduciary relationship with Khoury and SAI, submits that defendants' "duties"—referring presumably to their alleged duties of disclosure—"arose from a special business relationship of reposed trust and confidence which was breached."

In *Crim Truck & Tractor Co. v. Navistar International Transportation Corp.,* 823 S.W.2d 591, (Tex.1992), the court explained that "while the existence of a confidential relationship is ordinarily a question of fact, when the issue is one of no evidence, it becomes a question of law."  In this case, the jury was never called upon to consider whether such a relationship existed and consequently never found, implicitly or explicitly, that a fiduciary or confidential relationship existed between Imperial and SAI and/or Khoury.[9]  Neither was the jury apprised that the existence of a fiduciary relationship stood as a prerequisite to a verdict for fraud premised on a failure by SAI and/or Khoury, following execution of the premium finance

---

[9]A review of the record discloses no basis for the statement in Imperial's brief that "[i]n the case before the Court, the evidence amply supports the jury's finding that Plaintiff Imperial and Defendants SAI/Khoury had a special relationship."

12

agreement, to inform Imperial of the changes in carriers and coverage. Thus, even had the evidence tended to show a fiduciary or confidential relationship between the parties, the absence of a jury instruction on or jury finding of a fiduciary relationship would undermine any fraud verdict for plaintiff premised on such a duty. It is manifest, though, that there was no evidence from which the jury could have found such a duty had it confronted the issue, and therefore, as a matter of law, a jury verdict for fraud potentially based on such a duty cannot stand.

Recently, in *ARA Automotive Group v. Central Garage, Inc.*, 124 F.3d 720 (5th Cir.1997), after surveying pertinent Texas authority on the subject of fiduciary and confidential relationships, a panel of this court reversed a jury verdict for the plaintiff on its claim for breach of fiduciary duty upon concluding that the plaintiff's evidence was not sufficient to establish a fiduciary or confidential relationship. This was the court's conclusion, despite extensive evidence of a "long history of "oral and written agreements, joint undertakings, shared confidences and cooperative ventures'," marked by "cooperation and friendship." *Id.* at 724, 726. The court noted that in Texas, certain formal fiduciary relationships, such as principal/agent, attorney/client, partnership and trustee-cestui que trust, give rise to fiduciary duties as a matter of law. *Id.* at 723 (citing *Crim Truck,* 823 S.W.2d at 593-94). Other "informal relationships," termed "confidential relationships," may also give rise to a fiduciary duty "where one person trusts in and relies upon another, whether

13

the relation is a moral, social, domestic or merely personal one." *Crim Truck,* 823 S.W.2d at 594 (quoting *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 261 (1951)). But as the court made clear in *Crim Truck,* particularly in the business arena, trust and reliance alone are not sufficient ingredients for the relationship, for "[t]he fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship." *Id.* at 594. "Neither is the fact that the relationship has been a cordial one, of long duration, evidence of a confidential relationship." *Id.* at 595. Rather, a confidential relationship exists only where "one party is in fact accustomed to being guided by the judgment or advice of the other, or is justified in placing confidence in the belief that such party will act in its interest." *Thames v. Johnson,* 614 S.W.2d 612, 614 (Tex.Civ.App.—Texarkana 1981, no writ).

We recognize, as did the *ARA* panel, that under Texas law, " "a fiduciary duty will not be lightly created' since "it imposes extraordinary duties' and requires the fiduciary to "put the interests of the beneficiary ahead of its own if the need arises.' " *ARA,* at 723 (quoting *Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.,* 55 F.3d 181, 188 (5th Cir.1995)). And as was further noted in *ARA,* since the Texas Supreme Court's decision in *Crim Truck,* "few Texas cases have found fiduciary relationships outside of legal relationships that carry fiduciary duties as a matter of law." *Id.* at 726, and none had found such a relationship in "a transactional setting involving experienced managers," *id.*

14

This case now before the court obviously does not involve any of the formal relationships that automatically give rise to fiduciary duties, and therefore, Imperial could only have established a duty of disclosure which might support its claim of fraud by adducing sufficient proof of an informal, confidential relationship with SAI and/or Khoury. The only proof presented by Imperial toward that end was limited testimony that Imperial had a business relationship with SAI, and with Khoury, spanning a several year period, and that Imperial had given SAI, through Khoury, draft authority up to a certain amount. The fact that it extended them this authority, according to Imperial, clearly establishes the trust which it accorded SAI and Khoury. These facts are plainly insufficient to establish a fiduciary or confidential relationship between these parties for they would not have warranted Imperial's expecting that SAI and/or Khoury would put Imperial's interests ahead of their own. At best, Imperial established that it reposed a degree of trust—and not unlimited trust—in defendants' judgment and integrity. We would reiterate, though, "[t]he fact that one businessman trusts another ... does not rise to a confidential relationship." *Crim Truck,* 823 S.W.2d at 594.

For the reason that there was no fiduciary relationship between the parties, it follows that there could have been no legally sufficient basis for a fraud verdict premised on SAI's and/or Khoury's post-representation nondisclosure of the change in insurance carriers and coverages. Because the court submitted to the jury a single fraud interrogatory which did not differentiate

15

between the theories of fraud liability posited by plaintiffs, it is impossible for us to now determine whether or not the jury's verdict is legally sustainable. This court has said that "[w]hen a district court submits two or more alternative grounds for recovery to the jury on a single interrogatory and the plaintiff prevails, we ordinarily order a new trial if one of the grounds for recovery is "legally inadequate,' " *Reeves v. AcroMed Corp.,* 44 F.3d 300, 302 (5th Cir.), *cert. denied,* 515 U.S. 1104, 115 S.Ct. 2251, 132 L.Ed.2d 258 (1995) (citing *Walther v. Lone Star Gas Co.,* 952 F.2d 119, 126 (5th Cir.1992)), for in such a case, "the reviewing court cannot determine whether the jury based its verdict on a sound or unsound theory," *id.* (quoting *Pan Eastern Exploration v. Hufo Oils,* 855 F.2d 1106, 1123 (5th Cir.1988)).

> In most cases, "[w]here two [or more] claims have been submitted to the jury ... in a single interrogatory, a new trial may be required if one of the claims was submitted erroneously," unless we are " "reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it.' " *Braun v. Flynt,* 731 F.2d 1205, 1206 (5th Cir.), *cert. denied,* 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984) (quoting *E.I. du Pont de Nemours & Co. v. Berkley & Co.,* 620 F.2d 1247, 1258 n. 8 (8th Cir.1980)). Thus, if we find that the defendants were entitled to a directed verdict on any one of the ... theories of liability, we must remand the case for a new trial unless we are "reasonably certain" that the jury's verdict was not based upon the erroneously-submitted theory or theories.

*Woods v. Sammisa Co., Ltd.,* 873 F.2d 842, 849-50 (5th Cir.1989), *cert. denied,* 493 U.S. 1050, 110 S.Ct. 853, 107 L.Ed.2d 847 (1990).

Because we cannot be "reasonably certain" that the jury's verdict in this case was based on a sustainable theory of fraud, rather than on a legally invalid and hence erroneously submitted theory, we must reverse the verdict and remand the case for a new

16

trial on the plaintiff's charge that defendants SAI and/or Khoury made representations to Imperial which were false "when made." We would be compelled to do this even were we of the view that the jury's verdict on the breach of warranty claim was proper and could be upheld, since the jury, in addition to its verdict for compensatory damages, also awarded punitive damages which, under Texas law, are available for fraud but not for breach of contract. *See Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986). But plaintiff's claim for breach of warranty suffers a shortcoming similar to that identified with respect to its cause of action for fraud.

*Breach of Warranty*

As with its fraud claim, Imperial urged at trial that SAI and/or Khoury knew at the time the Agent/Broker Warranty was executed that the identity of the insurers, the terms of the policies obtained or to be obtained and the amount of premium for those policies which were set forth in the finance agreement were not correct. However, the jury was also permitted to find for Imperial on this claim even if it concluded that the matters warranted by Khoury and/or SAI were correct when the warranty was signed if the jury were to find that Khoury and/or SAI knew, prior to Imperial's disbursement of the loan funds, that Monterrey planned to purchase alternate coverage. In support of their contention that this latter theory could constitute a valid basis for imposing liability, Imperial reasons that because the finance agreement executed by the parties specifically requires Imperial's

17

written consent to changes in the agreement, then the agreement necessarily mandates that Imperial be notified of any changes in coverage.[10]  And while it concedes that Monterrey was not precluded by the agreement or otherwise from changing its insurance coverage, it maintains that in the event of any change in coverage, it was entitled to notice, and that therefore, even assuming that the policy information contained in the premium finance agreement was correct when the warranty was signed, the failure of SAI and/or Khoury to notify it of Monterrey's change of insurers, coverage and premium amounts constituted a breach of the contract.  Defendants are correct, however, in their contention that any *contractual* duty to notify Imperial of post-execution changes in coverage was Monterrey's, not Khoury's or SAI's, and any breach of that duty by Monterrey could not provide the basis of a verdict against SAI or Khoury for breach of the Agency/Broker Warranty.

*Personal Liability of Khoury*

Khoury argues that there is no factual basis upon which he could be held personally liable to Imperial on any theory of recovery.  In support of his position, he asserts that there was no evidence that he spoke directly with anyone at Imperial concerning Monterrey's insurance coverage or the premium finance agreement and that instead, all communications between Imperial and SAI were with SAI employee Sarah Estep.  In response to this contention, Imperial

---

[10]The agreement states in relevant part:

> ENTIRE DOCUMENT AND GOVERNING LAW.  This document is the entire agreement between Imperial and Borrower and can only be changed by a writing signed by both parties.

18

points to evidence which was presented at trial to demonstrate Khoury's intimate involvement in the transaction at issue from which, in our opinion, the jury could reasonably have inferred that at the time he signed the Agent/Broker Warranty, Khoury knew that the information included in the agreement was false, or that he made the warranty regarding Monterey's insurance coverage recklessly without any knowledge of the truth.

Khoury insists further, though, that he did not sign the warranty in his personal capacity but rather did so solely in a representative capacity as an agent for his disclosed principal, SAI, as evidenced by the fact that SAI, and not Khoury, was identified as the "Agent" in the upper left-hand corner of the document.[11]  It is clear under Texas law that since Khoury's signature appears on the Agent/Broker Warranty, unaccompanied by any designation to suggest that he was signing on behalf of SAI, then at least in the absence of any proof by Khoury that he disclosed to Imperial at the time of the transaction that he was signing the document in a representative capacity, he cannot escape personal liability on the warranty.  *See Seale v. Nichols,* 505 S.W.2d 251 (Tex.1974);  *see also Griffin v. Ellinger,* 538 S.W.2d 97 (Tex.1976);  *A to Z Rental Center v. Burris,* 714 S.W.2d 433 (Tex.App.—Austin 1986, writ ref'd n.r.e.).  And this is so even

---

[11]Khoury notes that while his signature appears under the Agent/Broker Warranty on the premium finance agreement, he did not actually sign the document himself but rather his signature was stamped on the form by a secretary.  However, Khoury has not contended that he did not authorize the placement of his signature on the document, and in fact, he implicitly acknowledged at trial that his signature was placed on the warranty with his approval.

though the identity of his principal, SAI, was disclosed in the agreement. *Cf. Griffin,* 538 S.W.2d at 99 (fact that name of corporation appeared on check and account was that of corporation does not establish that signer signed check in representative capacity).

We have considered the other issues raised by the defendants and find them without merit.

Accordingly, we REVERSE the district court's ruling denying defendants' motion for new trial and REMAND this case for a new trial consistent with this opinion.