## UNITED TEACHER ASSOCIATES INSURANCE COMPANY, Plaintiff,

v.

## UNION LABOR LIFE INSURANCE COMPANY and Union Standard Of America Life Insurance Company, Defendants.

### No. A–02–CA–078–LY.

United States District Court, W.D. Texas, Austin Division.

March 31, 2004.

Linda Jene Burgess, Winstead, Sechrest & Minick, P.C., Dallas, TX, Keith Russell,

Houston, TX, for United Teacher Associates Insurance Co., plaintiff.

Francine W. Breckenridge, Strasburger and Price L.L.P., Austin, TX, Nicholas T. Christakos, Sutherland Asbill & Brennan, LLP, Rebecca L. Hirsch, Sutherland Asbill & Brennan LLP, Bryan M. Haynes, Gail Westover, Sutherland, Asbill & Brennan LLP, Washington, DC, Jeff L. Rose, Office of Attorney General, State of Texas, Austin, TX, for Union Labor Life Insurance Company, Union Standard of America Life Insurance Co., defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

YEAKEL, District Judge.

BE IT REMEMBERED that on September 16, 2003, the Court called the above-styled action for bench trial. Plaintiff United Teacher Associates Insurance Company ("United Teacher") appeared by designated representative and by counsel; Defendants Union Labor Life Insurance Company and Union Standard of America Life Insurance Company (collectively, "Union Labor") appeared by designated representative and by counsel. Having carefully considered the evidence presented at trial, the applicable law, the oral arguments, and the written briefs, the Court concludes that United Teacher is not entitled to recover damages from Union Labor. The Court makes the following findings of fact and conclusions of law holding, in summary, that Union Labor did not commit fraud in its dealings with United Teacher.

*Venue and Jurisdiction*

United Teacher originally filed suit in the 126th Judicial District Court of Travis County, Texas. Pursuant to 28 U.S.C. § 1441 and § 1446(a), Union Labor timely removed the action to this Court, asserting

jurisdiction based on the parties' diversity of citizenship. *See* 28 U.S.C. § 1332. United Teacher is a Texas corporation with its principal place of business in Texas; both Defendants are Maryland corporations with their principal places of business in Washington, D.C.

### Facts

This is a dispute between insurance companies involving the sale of two books of business-one containing Medicare Select policies and one containing Medicare Supplement policies (collectively, the "Medicare Block").[1] The purchaser, United Teacher, claims that the seller, Union Labor, fraudulently concealed the existence of two consent orders signed by Union Labor and the Florida Department of Insurance, which greatly restricted potential rate increases on the policies.[2]

In 1999 Union Labor sought to sell its Medicare Block. Michael Fasano, Osman Shirwany, and Jennifer Lazio, Union Labor employees, provided information about the policies to potential buyers, including Larry Doze, United Teacher's president and chief actuary, who performed United Teacher's "due diligence" for the potential purchase.[3] Doze had performed due-diligence examinations in over three hundred potential insurance acquisitions, including a transaction that he closed with Union Labor in 1995. As part of his due dili-

gence in the transaction before this Court, Doze sent Fasano a two-page request for information and used Fasano's answers to calculate a bid for the policies and to serve as a starting point for further information gathering. *See* Plaintiff's Ex. 32. Significantly, the request did not specifically request information concerning any state regulatory action that affected the policies in the Medicare Block. On November 19, 1999, Doze submitted an offer to pay $1.1 million for the Medicare Block and requested additional information from Union Labor, including quarterly updates of financial information.

On February 3, 2000, the parties entered into a letter agreement (the "Letter Agreement"), which, among other things, governed the parties' rights and obligations with respect to the transaction until final agreements were executed. The Letter Agreement provided, *inter alia,* as follows:

> During the period from the date of this letter until the execution of the Agreement(s) ..., [Union Labor] shall cause its officers, directors, agents, employees and representatives ... to give [United Teacher] or its dully [*sic*] authorized agents access during regular business hours, upon at least 24 hours notice, to all of the books, records, properties, and facilities of [Union Labor] relating to the

---

1. Medicare Select and Medicare Supplement policies provide health insurance benefits that supplement benefits available under Medicare. Both provide an ongoing obligation to pay for the benefits covered by the policies as long as the policies are in effect.

2. Florida business constituted 58% of the policies and 68% of the premium dollars in the Medicare Block. The 1997 consent order restricted rate increases on the Florida Medicare Select policies to trend increases only for two years, after which the lifetime loss ratio on the policies would be reevaluated. (The "trend" component of a premium rate is based on factors such as inflation and the cost

of medical services.) The 1999 consent order restricted rate increases on the Florida Medicare Supplement policies to 12% on policies in force before October 1999 and restricted future rate increases to trend only.

3. Black's Law Dictionary defines due diligence as "1. The diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation.-Also termed *reasonable diligence.* 2. *Corporations & securities.* A prospective buyer's or broker's investigation and analysis of a target company, a piece of property, or a newly issued security." Black's Law Dictionary 468 (7th ed.1999).

Policies, and, *upon [United Teacher's] request, to furnish it with any information reasonably required to complete due diligence with respect to the [Medicare Block].*

(Emphasis added.) Again, United Teacher did not specifically request information regarding regulatory action.

In late 1999 or early 2000, Lazio sent Doze 1998 rate-filing information for the Florida Medicare Supplement policies [4] as well as an actuarial memorandum regarding the Medicare Select policies. These documents reflected anticipated lifetime loss ratios of 65% and 67.8% respectively on the policies.[5] United Teacher alleges that these ratios were false and that Union Labor knew they were false when Lazio gave the documents to Doze.[6] Further United Teacher asserts that Union Labor knew Doze would rely on the inaccurate loss ratios to project the value of the policies. Throughout negotiations, Union Labor continued to provide financial information, correspondence with departments of insurance in states *other* than Florida, and rate filings, but did not inform United Teacher of the consent orders, which restricted future rate increases in Florida.[7] Doze testified that an insurance company usually must request a rate increase when it takes over a block of business, in order to ensure that the business will be profitable. If there has been recent regulatory action, it is difficult to obtain an increase. However, United Teacher never specifically requested information concerning the existence of any regulatory impediments that might impact the policies.

In the fall of 2000, negotiations between United Teacher and Union Labor began to break down. In an effort to salvage the deal, Doze requested updated rate information. Lazio informed him that the Florida Department of Insurance had approved a 12% increase in the Florida Medicare Supplement premiums and an 8% increase in the Medicare Select premiums, but did not tell Doze that the rate increases were affected by consent orders. United Teacher asserts that Union Labor failed to mention the consent orders because of their potential effect on the Medicare Block's profitability and particularly because negotiations were faltering at that point.

United Teacher declined to close on the Letter Agreement, and on December 6, 2000, Union Labor sued United Teacher in federal court in Washington, D.C. (the "D.C. action") alleging that the parties had an enforceable contract for the sale of the Medicare Block and seeking specific performance. In the spring of 2001, after

**4.** The premium rates that insurers may charge on Medicare Select and Supplement policies are subject to regulation by state insurance departments.

**5.** Black's Law Dictionary defines loss ratio as "1. *Insurance.* The ratio between premiums paid and losses incurred during a given period." Black's Law Dictionary 958 (7th ed.1999). Doze testified that loss ratio is the "most critical phase in analyzing business." "Losses" equate to benefits paid pursuant to the policies. Florida requires that more than 65% of the premiums collected be paid out in benefits to policyholders.

**6.** Soon after entering the 1999 consent order, Union Labor stopped issuing Medicare Supplement policies in Florida. United Teacher contends that Union Labor knew such an action would lock the lifetime loss ratio on the Medicare Supplement policies at 90%. Further, United Teacher contends that the Florida Department of Insurance told Union Labor that the lifetime loss ratio on the Medicare Select policies would rise to 78.6% (and then to 84.6%), pursuant to the 1997 consent order. But Union Labor did not inform United Teacher of these changes or of their alleged cause-the consent orders.

**7.** *See supra* note 1. United Teacher asserts that Union Labor knew when it entered into the consent orders that an upward shift in the blocks' lifetime loss ratios would severely limit the blocks' potential profitability.

conducting discovery in the D.C. action, the parties resumed negotiations in an attempt to settle the case. Doze expressed concern about the high loss ratios and proposed to "buy" the Medicare Block for a negative $5 million (*i.e.,* Union Labor would pay United Teacher $5 million to take the policies, as opposed to United Teacher's original bid, whereby United Teacher would pay $1.1 million to Union Labor). Doze told Lazio that he was assuming 20% rate increases in Florida, but Lazio did not tell him that these assumptions were incorrect in light of the consent orders. Lazio testified that she did not know the consent orders would be binding on United Teacher.

In the summer of 2001, the parties reached a tentative agreement. Pursuant to the parties' representation that they had reached a settlement, the District of Columbia court dismissed the action on September 4, 2001, stating that the dismissal was without prejudice for thirty days. If neither party moved to reopen the case by October 4, 2001, the action would be dismissed with prejudice. The court later granted Union Labor's motion to extend the deadline to reopen the action, stating that the case "shall be deemed dismissed with prejudice should counsel fail to reopen the case by the new deadline of October 31, 2001." No party moved to reopen the case.

In contemplation of acquiring the Medicare Block; Doze requested that United Teacher prepare the 2001 rate filings required by the states in which the Medicare Block policies were sold. Union Labor agreed that Doze would do the filings in all states except Florida. Union Labor prepared the 2001 Florida filing, requesting that Florida allow a 100% rate increase in the Florida Medicare Supplement premiums. Union Labor asserts that it prepared the Florida filing because it had access to the information needed. United

Teacher responds that Union Labor insisted on controlling the Florida filing to prevent United Teacher from discovering the consent orders and that Union Labor requested the 100% rate increase to intentionally mislead United Teacher into believing that there were no impediments to rate increases. Lazio reported to Doze that the Florida Department of Insurance had approved an 18% increase in the Medicare Select premiums, with the 100% request in the Medicare Supplement premiums still pending. Ultimately, the Florida Department of Insurance offered a 6% increase on the Medicare Supplement premiums, which Union Labor accepted.

After Lazio informed him of the 6% rate increase, Doze requested the 2001 Florida rate filings as well as Union Labor's communications with the Florida Department of Insurance. Lazio claimed that the information was not readily available, although Gary Lake, Union Labor's outside consultant who handled the filings, testified that he sent the information to Union Labor in July. Lipei Chen, a United Teacher actuary, also requested the Florida rate filings from Lazio, but never received them. Chen recommended that a conference call be set up with Union Labor to discuss why the approved rate increase in the Medicare Supplement premiums was so low.

On October 4, 2001, in contemplation of the transaction's closing, the parties signed an Agreement for Reinsurance containing the following clause:

3.11. *Company Disclosure.* To the best of the Company's [Union Labor's] knowledge, information and belief, no warranty or representation made by the Company in this Agreement nor in any writing furnished or to be furnished by the Company to the Reinsurer [United Teacher] pursuant hereto or in connection herewith contains or will contain

any untrue statement of a material fact or omits or will fail to state, any material fact necessary to make the statements contained herein or therein not misleading.

On October 15, 2001, the transaction closed *without* the conference call suggested by Chen having taken place and *without* the 2001 rate-filing information having been sent to United Teacher. On October 22, 2001, Lazio and Shirwany of Union Labor and Chen and Michael Prager of United Teacher conferred by conference call. During the call, Lazio mentioned the 1999 consent order. United Teacher contends that this was its first knowledge of either consent order. United Teacher again requested copies of the 2001 Florida rate filings, which Lazio produced on November 8, 2001. By that time, however, the October 31, 2001 deadline for reopening the D.C. action had passed.

On December 18, 2001, after investigating the 1999 consent order, United Teacher notified Union Labor of its intent to rescind the transaction and filed suit in state court in Travis County, Texas the same day. On February 4, 2002, Union Labor removed the action to this Court.[8]

### Partial Summary Judgment

On August 7, 2003, this Court, the Honorable James R. Nowlin presiding, signed a partial summary judgment in this action, finding (1) that United Teacher's claims based on the 1999 consent order were not barred by *res judicata* based on the D.C. action; (2) that the transaction was an arm's-length sale of assets between sophisticated corporate parties that did not warrant the imposition of a duty of "utmost good faith;" and (3) that whether Union Labor owed a duty to disclose the consent orders during the parties' negotiations in-

volved issues of fact not suitable for resolution by summary judgment.

### Issue

The issue now before this Court is whether either affirmative representations made by Union Labor during the parties' negotiations or Union Labor's failure to disclose the consent orders to United Teacher before the sale of the Medicare Block closed constitutes fraud.

### Findings and Conclusions

 To determine state-law questions, federal courts look to final decisions of the highest court of the state. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *St. Paul Fire & Marine Ins. Co. v. Convalescent Servs., Inc.,* 193 F.3d 340, 342 (5th Cir. 1999). Where there is no ruling by the state's highest court, it is the duty of the federal court to determine, as best it can, what the highest court of the state would decide. *St. Paul Marine,* 193 F.3d at 342 (citing *Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.,* 953 F.2d 985, 988 (5th Cir.1992)). To establish fraud, United Teacher must show (1) that Union Labor made a false material representation; (2) that Union Labor knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) that Union Labor intended to induce United Teacher to act upon the representation; and (4) that United Teacher justifiably relied on the representation and thereby suffered injury. *See Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001).

### A. Fraud by Nondisclosure

 "As a general rule, a failure to disclose information does not constitute

---

**8.** Pursuant to a conversation with the Florida Department of Insurance, United Teacher discovered the 1997 consent order on October

22, 2002, well after the case now before this Court had been filed.

fraud unless there is a duty to disclose the information." *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex.2001) (citing *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex.1998)). "Thus, silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent." *Id.* (citing *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex.1995); *Smith v. National Resort Cmtys., Inc.*, 585 S.W.2d 655, 658 (Tex.1979)). Whether a duty to disclose information exists is a question of law. *Id.* (citing *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 633 (Tex.App.—San Antonio 1993, writ denied)).

### 1. Duty to disclose

■ **a. Duty to disclose by operation of law.** "Generally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship." *Morris*, 981 S.W.2d at 674. Although in *Bradford* the Texas Supreme Court did not depart from the rule enunciated in *Morris*, *SmithKline Beecham*, and *Smith*, the court generally outlined the state of the law in Texas with regard to the duty to disclose in the instance of an arm's-length business transaction, noting that several Texas courts of appeals have found a duty to disclose information absent a confidential or fiduciary relationship, such as "when a party makes a partial disclosure that, although true,

conveys a false impression." *Bradford*, 48 S.W.3d at 755 (citing *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex.App.—Houston [14th Dist.] 1997, no writ); *Ralston Purina*, 850 S.W.2d at 636). The Texas Supreme Court also observed that section 551 of the Restatement (Second) of Torts recognizes a general duty to disclose facts in a commercial setting.[9] *See id.* (citing Restatement (Second) of Torts § 551 (1977)). The supreme court emphasized that Texas has "never adopted section 551." *Id.* at 756 (citing *SmithKline Beecham*, 903 S.W.2d at 352). Since *Bradford* several Texas courts of appeals and United States district courts applying Texas law have addressed duties to disclose in commercial arm's-length transactions. Some, although recognizing that Texas has not adopted section 551 of the Restatement, nevertheless address the section's applicability to the facts of the case. *See, e.g., Pellegrini v. Cliffwood–Blue Moon Joint Venture*, 115 S.W.3d 577, 580 (Tex.App.—Beaumont 2003, no pet.) (finding no duty to disclose information in arm's-length business transaction because plaintiff had opportunity, knowledge, and expert ability to discover information he claimed was fraudulently concealed).

The Fourteenth Court of Appeals, acknowledging that Texas has not adopted section 551 nor expanded the circumstances in which a duty to disclose arises

**9.** The Restatement recognizes "a duty to exercise reasonable care to disclose to the other [party in a business transaction] before the transaction is consummated, (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to

be so; and (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." Restatement (Second) of Torts § 551(2) (1977).

beyond confidential or fiduciary relationships, has nevertheless followed its *Hoggett* decision in addressing whether a duty to disclose exists in certain arm's-length transactions absent a confidential or fiduciary relationship. *See, e.g., Fleming v. Texas Coastal Bank,* 67 S.W.3d 459, 461–62 n. 2 (Tex.App.—Houston [14th Dist.] 2002, pet. denied) (finding defendant did not owe duty to disclose because no fiduciary relationship existed and defendant bank's partial disclosures were not so misleading as to require further disclosure). *Hoggett* recognizes a duty to disclose in four situations: "(1) when there is a fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression." *Hoggett v. Brown,* 971 S.W.2d 472, 487 (Tex.App.—Houston [14th Dist.] 1997, no writ) (citing *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 941 S.W.2d 138, 146–47 (Tex.App.-Corpus Christi, 1995), *rev'd on other grounds,* 960 S.W.2d 41 (1998); *Ralston Purina,* 850 S.W.2d at 635–36). *Hoggett*'s requirements are similar to those of the Restatement. The Texas Supreme Court, however, has specifically declined to adopt such a general duty of disclosure. *Bradford,* 48 S.W.3d at 756.

The Fifth Circuit, interpreting Texas law, has sometimes determined that a duty to disclose arises *only* when a fiduciary or confidential relationship exists, but in other cases has cited the more expanded duties derived from section 551 and vari-ous Texas courts of appeals cases. For example, in *Imperial Premium Finance, Inc. v. Khoury,* 129 F.3d 347 (5th Cir. 1997), the plaintiff provided financing for the defendant's client's insurance policies. The client defaulted and the plaintiff sued the defendant insurance company and its president for fraud, alleging that the defendant misrepresented the client's insurers, the amount of the premiums, and the cancellation terms of the policies financed by the plaintiff. In reversing a jury verdict finding the defendants liable for fraud premised on nondisclosure where no fiduciary relationship existed, the Fifth Circuit stated, "Under Texas law, in the absence of a duty to disclose, mere silence does not amount to fraud or misrepresentation; and a duty to disclose arises only where a fiduciary or confidential relationship exists." *Id.* at 352 (citing *Bay Colony, Ltd. v. Trendmaker, Inc.,* 121 F.3d 998, 1004 (5th Cir.1997)). More recently, but before *Bradford,* the Fifth Circuit recognized additional circumstances in which a duty to disclose might arise, such as when a party volunteers some but not all material information, and the partial disclosure would be misleading without full disclosure. *See Union Pac. Res. Group, Inc. v. Rhone Poulenc, Inc.,* 247 F.3d 574, 584–86 (5th Cir.2001). The circuit court, however, presumed that Texas law "is in accord" with the Restatement. *Id.* at 584 n. 24. It is not. *Bradford,* 48 S.W.3d at 756.[10] Thus, in determining Texas law, this Court will rely on *Bradford. See Erie R.R.,* 304 U.S. at 78–79, 58 S.Ct. 817.

■ United Teacher alleges that Union Labor had a duty to disclose the consent orders based on a confidential relationship

---

**10.** The Fifth Circuit decided *Union Pacific Resources* on April 5, 2001. *Union Pac. Res. Group, Inc. v. Rhone Poulenc, Inc.,* 247 F.3d 574, 574 (5th Cir.2001). The Texas Supreme Court decided *Bradford* three weeks later on April 26, 2001. *Bradford v. Vento,* 48 S.W.3d 749, 749 (Tex.2001). The circuit thus did not have the benefit of *Bradford* when it determined *Union Pacific Resources.*

as well as the general duty described in section 551 and *Hoggett*. Because the Texas Supreme Court has only explicitly recognized a duty to disclose arising in a confidential or fiduciary relationship, this Court rejects the general-duty approach and holds, as a matter of law, that for a duty of disclosure to arise there must be a confidential or fiduciary relationship between the parties.

■■■■ *i. Confidential or fiduciary relationship.* Certain relationships give rise to fiduciary duties as a matter of law, although "other 'informal relationships,' termed 'confidential relationships,' may also give rise to a fiduciary duty 'where one person trusts in and relies upon another, whether the relation is a moral, social, domestic or merely personal one.'" *See Khoury*, 129 F.3d at 353 (quoting *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992)). However, particularly in the business arena, trust and reliance alone are not sufficient ingredients to create such a relationship. *See id.* Texas law is clear that "mere subjective trust does not, as a matter of law, transform arms-length dealing into a fiduciary relationship." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex.1997); *see Khoury*, 129 F.3d at 353 (stating that "trust and reliance alone" are insufficient to generate confidential relationship); *see also Crim Truck*, 823 S.W.2d at 595 (citation omitted) (finding that forty-two-year business relationship between franchisor and franchisee did not give rise to confidential relationship despite testimony by franchisee that he believed relationship to be one of mutual trust and confidence).[11] The only evidence

presented by United Teacher on this issue is Doze's testimony that as a result of his previous business experience with Union Labor, he had a greater level of trust and confidence in Union Labor and believed Union Labor's actuaries would again be honest and forthcoming and would provide all necessary information to him. This evidence is insufficient to establish a confidential relationship between two sophisticated business entities dealing at arm's-length.

The Court finds that, under the facts presented here, Union Labor had no duty to disclose the existence of the Florida consent orders to United Teacher due to a confidential relationship between the parties.

■■■■ *b. Duty to disclose by agreement of the parties.*[12] United Teacher argues that a duty to disclose may also arise by agreement between the parties. *See Trustees of the Northwest Laundry & Dry Cleaners Health & Welfare Trust Fund v. Burzynski*, 27 F.3d 153, 157 (5th Cir.1994). But *Burzynski* neither finds support in Texas authority nor involves a duty arising by agreement, but an alleged duty arising from a confidential relationship. *See id.* at 158–59. Union Labor argues that United Teacher's fraud claim cannot be based on a provision in the parties' contract, citing *Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493 (Tex.1991). In *DeLanney*, the plaintiff brought negligence and Deceptive Trade Practices Act claims against Southwestern Bell for mistakenly deleting his advertisement from the Galveston Yellow Pages. The jury found that Southwestern Bell was negli-

---

11. After *Crim Truck*, the Texas Legislature created a statutory duty of good faith and fair dealing among parties to a car-dealership franchise agreement. *See* Tex. Occ.Code Ann. § 2301.478 (West 2004).

12. There is no single contract between the parties. Multiple documents comprise the parties' agreement. For simplicity the Court will refer to the parties' "contract" or "agreement" as if it were found in a single document.

gent and the court of appeals affirmed. But the Texas Supreme Court found that the plaintiff could not bring a tort claim against Southwestern Bell because Southwestern Bell's duty to publish the advertisement arose solely from the contract and the plaintiff's damages-lost profits-arose solely from Southwestern Bell's failure to perform the contract; thus, the plaintiff's only viable claim was for breach of contract. Following *DeLanney,* several state appellate courts held that tort damages were not recoverable for fraudulent inducement unless the plaintiff suffered an injury separate from the economic loss that would be available for breach of contract. *See, e.g., Grace Petroleum Corp. v. Williamson,* 906 S.W.2d 66, 68–69 (Tex. App.—Tyler 1995, no writ); *Parker v. Parker,* 897 S.W.2d 918, 924 (Tex.App.—Fort Worth 1995, writ denied); *Barbouti v. Munden,* 866 S.W.2d 288, 293–94 (Tex. App.—Houston [14th Dist.] 1993, writ denied); *River Consulting, Inc. v. Sullivan,* 848 S.W.2d 165, 170 (Tex.App.—Houston [1st Dist.] 1992, writ denied). However, in *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors,* 960 S.W.2d 41 (Tex. 1998), the Texas Supreme Court rejected applying *DeLanney* to preclude tort damages in fraud cases, noting that the "legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself." *Id.* at 46. "[I]f a plaintiff presents legally

sufficient evidence on each of the elements of a fraudulent inducement claim, any damages suffered as a result of the fraud sound in tort." *Id.* at 47. Thus, United Teacher's claim may exist either within or without its contract with Union Labor.

Addressing the agreement, the parties disagree about which contract provision governed their negotiations. Union Labor argues that the Letter Agreement, which explicitly made United Teacher responsible for requesting information reasonably required to complete due diligence,[13] governed the negotiations, while United Teacher argues that clause 3.11 of the Agreement for Reinsurance established a duty to disclose material information necessary to make other statements not misleading.[14] The Court agrees with Union Labor that the Letter Agreement governed the parties' negotiations and did not impose a heightened duty of disclosure on Union Labor. Further, the Court finds that the Agreement for Reinsurance, rather than retroactively imposing a duty to disclose during negotiations, was instead an affirmative representation, subject to the general rules regarding fraud. *See Ernst & Young,* 51 S.W.3d at 577.

The Court is incredulous that United Teacher, an experienced company with experienced personnel that had a history of dealing with the regulated business of insurance, would fail to explicitly request

**13.** The Letter Agreement states: "During the period from the date of this letter until the execution of the Agreement(s) . . . , [Union Labor] shall cause its officers, directors, agents, employees and representatives . . . to give [United Teacher] or its dully [sic] authorized agents access during regular business hours, upon at least 24 hours notice, to all of the books, records, properties, and facilities of [Union Labor] relating to the Policies, and, upon [United Teacher's] request, to furnish it with any information reasonably required to complete due diligence with respect to the Policies."

**14.** Clause 3.11 states: *"Company Disclosure.* To the best of the Company's [Union Labor's] knowledge, information and belief, no warranty or representation made by the Company in this Agreement nor in any writing furnished or to be furnished by the Company to the Reinsurer [United Teacher] pursuant hereto or in connection herewith contains or will contain any untrue statement of a material fact or omits or will fail to state, any material fact necessary to make the statements contained herein or therein not misleading."

Union Labor's history with the insurance departments of each state in which Union Labor did business, particularly Florida, where the largest numbers of the policies to be purchased had been originally sold. The burden was on United Teacher to request the information it desired to examine before deciding whether to proceed with the transaction. It was not Union Labor's burden to guess what United Teacher wanted. United Teacher presented no evidence that the Florida consent orders were not public record and no explanation why United Teacher did not contact the regulatory authorities in Florida and other states in which policies included in the Medicare Block had been sold to determine what regulatory action was reflected with regard to Union Labor. After a careful examination of all of the documents introduced in evidence during the trial of this cause, the Court must conclude that United Teacher conducted a less than thorough due-diligence investigation. This in spite of the fact that United Teacher knew that the Medicare Block was of questionable value, so much so that United Teacher would pay nothing for the policies and would receive $5 million to take them.

### B. Fraud by False Material Representation

■ Having found that Union Labor owed no duty to United Teacher to disclose the existence of the consent orders, the Court turns to the traditional fraud elements: United Teacher must show that (1) that Union Labor made a false material representation; (2) that Union Labor knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) that Union Labor intended to induce United Teacher to act upon the representation; and (4) that United Teacher justifiably relied on the representation and thereby suffered injury. *See Ernst & Young*, 51 S.W.3d at 577 (Tex.2001).

### 1. The 1998 rate filing and actuarial justification

United Teacher alleges that the 1998 rate filing and actuarial-justification memorandum which Lazio gave to Doze in late 1999 or early 2000 contained false representations of the Medicare Block's lifetime loss ratios. These documents were generated by Union Labor in preparing its 1998 Florida rate filing. Although the loss ratios continued to increase beyond the percentages listed in these documents, Union Labor continued to provide data throughout negotiations from which United Teacher could have derived the increasing loss ratios. Based on the fact that Union Labor continued to provide information which could have (and should have) led United Teacher to discover that the information in the 1998 rate-filing documents was outdated, the Court concludes that United Teacher's reliance on these documents was not justified.

### 2. Clause 3.11 of the Agreement for Reinsurance

■ In the Agreement for Reinsurance, which preceded the closing of the sale, Union Labor represented that "[t]o the best of [Union Labor's] knowledge, information and belief, no warranty or representation made by the Company in this Agreement nor in any writing furnished or to be furnished by [Union Labor] to [United Teacher] pursuant hereto or in connection herewith contains or will contain any untrue statement of a material fact or omits or will fail to state, any material fact necessary to make the statements contained herein or therein not misleading." The Court interprets this clause as an affirmative representation that Union Labor disclosed all material information necessary to make other representations related to the sale not misleading.

*a. Omitted material information.* United Teacher asserts that the omitted material information was the existence of the consent orders and that disclosing the existence of the consent orders was necessary to make other information provided by Union Labor during negotiations not misleading. There can be no doubt, and the Court finds, that the existence of the consent orders and their content was information material to United Teacher in analyzing the proposed purchase. United Teacher offers several examples of how information furnished by Union Labor was rendered misleading by the failure to disclose the consent orders. Lazio disclosed to Doze that Union Labor received a 12% rate increase on the Florida Medicare Supplement policies on June 22, 1999, and an 8% rate increase for the Florida Medicare Select policies on December 16, 1999, without disclosing that these increases were related to the 1997 and 1999 consent orders. Later, in connection with the 2001 Florida rate filings, Lazio advised Doze that Union Labor had received an 18% rate increase on the Medicare Select business and that the 100% request on the Supplement business was pending. When Florida offered a 6% rate increase (rather than the 100% requested), Lazio did not inform Doze that the low increase was the result of the 1999 consent order.

*b. Union Labor's knowledge and intent.* United Teacher alleges that Union Labor knew the consent orders were material and intentionally concealed them from United Teacher during negotiations. As evidence of Union Labor's fraudulent intent, United Teacher points to Union Labor's insistence on performing the 2001 Florida rate filing, which, if performed by United Teacher, would have led to its discovery of the consent orders. United Teacher argues that Union Labor's failure to send the 2001 filing information to Doze promptly after he requested it is further evidence of Union Labor's intent to conceal the consent orders. However, Union Labor explained that it performed the 2001 Florida rate filing because it had access to the necessary information and that when Doze later requested the filing information, it was not readily available because an outside consultant had actually prepared the filing. Further, Lazio, a young actuary with almost no experience in conducting due diligence for the purchase or sale of a business, credibly testified that she did not know that the consent orders, signed by Union Labor and the Florida Department of Insurance, would also bind United Teacher and that, since Doze did not specifically request information in the category of the consent orders, she did not think to produce them.

United Teacher has presented evidence that Union Labor may have intended to conceal the consent orders, but Union Labor's explanations for its allegedly suspicious behavior are plausible. United Teacher has failed in its burden of proof and persuasion.

*c. United Teacher's reliance.* The evidence shows that United Teacher knew early on that purchasing the Medicare Block might not be a profitable transaction. For example, United Teacher attempted to extricate itself from the deal in late 2000, leading to the D.C. action. Further, the surprisingly low 6% rate increase on the Florida Supplement business in 2001 raised red flags in the eyes of almost everyone at United Teacher. Doze admits he was surprised, though he accepted the increase as typical of the Florida Department of Insurance. Chen, however, was very surprised by the low rate increase and suggested a conference call with Union Labor to find out why the increase was so low. Billy Hill, the new president of United Teacher, was so shocked by the 6% increase that he believed United Teacher should not have closed the deal until the

issue was resolved. Nevertheless, with full knowledge of the low increase and without having received the rate information he requested, Doze, an actuary with experience performing due diligence in over three-hundred potential acquisitions, closed the deal on October 15, 2001. The conference call that Chen suggested took place *after* the deal closed, on October 22, 2001, at which time Union Labor disclosed the existence of the 1999 consent order.

In light of all of the information known to United Teacher and information that it could have acquired with a reasonable effort, the Court finds that the representation in clause 3.11 regarding disclosure of material information did not relieve United Teacher of the obligation to conduct a thorough due-diligence investigation, and it was the lack of such investigation that led to United Teacher's purchasing policies that appear to have less value than originally thought by United Teacher.

### Conclusion

In the final analysis, the burden of proof is on United Teacher to prove each element of its case. Although United Teacher has come forth with some evidence in support of its allegations, the Court finds that it has failed to prove them by the greater weight of the credible evidence. The Court finds that Union Labor did not commit fraud-either by failing to disclose the existence of the two consent orders or by making false affirmative representations-during its negotiations to sell the Medicare Block to United Teacher.

In accordance with the foregoing, the Court enters the following orders:

It is **ORDERED** Plaintiff United Teacher Associates Insurance Company **TAKE NOTHING** from Defendants Union Labor Life Insurance Company and Union Standard of America Life Insurance Company.

It is further **ORDERED** that Defendants Union Labor Life Insurance Company and Union Standard of America Life Insurance Company recover their costs in defending this action.

It is finally **ORDERED** that all other relief requested is **DENIED**.